Davis, Judge,
delivered the opinion of the court:
The plaintiff is a joint venture — comprising the same nine large construction enterprises which, were building the Bull Shoals Dam for the Government in Arkansas (see Ozark Dam Constructors v. United States, 153 Ct. Cl. 120, 288 F. 2d 913 (1961))—which was formed for the sole purpose of contracting with the Government to manufacture sand and crushed rock (called “aggregate”) from limestone found in a government-owned mountain (Lee Mountain) near the Bull Shoals area and to deliver this aggregate to the dam site for use in the concrete required for the Bull Shoals Dam. The work was to be done at specified unit prices per ton of material, and estimated quantities were set forth in the contract. The main issue before us arises out of the plaintiff’s claim that the defendant misrepresented the nature of the material embedded in Lee Mountain, with the result that plaintiff was forced to do much additional work to find and extract usable crushed *360 rock for tbe aggregate to be deposited at Bull Shoals. Defendant denies any misrepresentation and asserts that plaintiff possessed all the requisite information or had it readily available.
Commissioner Bennett has filed a comprehensive report of 52 pages, dealing with all the factual aspects of plaintiff’s claim. The parties have elaborately challenged major portions of those findings, and each repulses the assaults made by the other. We have been favored by a massive amount of argumentation.[1] However, we are fortunately spared, from delving into these voluminous attacks in depth on the 79 detailed findings; for us the primary issue can be adequately resolved on the basis of a relatively narrow segment of the evidence. Accordingly, we do not pass upon the various challenges to the findings which are irrelevant to our disposition of the case; instead we accept arguendo the Commissioner’s findings on those points, making.it clear that we have reviewed only those challenged findings which are critical to our decision (as indicated in this opinion).
Under its contract plaintiff was to dig into Lee Mountain,, extract large amounts of rock, crush the rock and form aggregate, and transport the aggregate to Bull Shoals. For coarse aggregate plaintiff was to be paid $2.41 a ton, and the estimate was that 2,700,000 tons would be extracted. For fine-aggregate the ton price was $2.54, and the estimate was. 1,100,000 tons. Plaintiff was also to be paid $.30 per cubic-yard for waste material stripped or scalped from above or around the rock formations; it is agreed, however, that the-price of $.30 is less than the actual unit cost of such removal,, and was inserted by the defendant in the contract in order-to keep waste material to a minimum.[2]
A major consideration in bidding on quarrying work of' this kind is the nature of the material underlying the surface of the quarrying area. Limestone is a good source of rock' *361 for aggregate, and it was known to be there. But limestone is also a soluble rock commonly possessing cavities as a result of the chemical action of water upon the stone in past eras. If these cavities are empty or filled (partially or wholly) with sand, the job is a normal one since sand does not hinder the breaking up of limestone for the aggregate which is the ■end-product of the quarrying; but if these limestone cavities are filled with clay, unusable for aggregate and contaminating the rock, there is much additional material to be stripped or scalped, and then wasted, in the course of finding and separating rock untainted by clay.
Plaintiff found much more clay-contaminated rock than ¡(it now says) it expected or was led to expect, and was therefore required to remove much more waste material.[3] It also says that because of the clay it was forced to change from an operation at the side of the mountain tó a more difficult and expensive one at the crest. Its claim is that it did not know and was not told of the probable extent and areas •of the clay in Lee Mountain, but that defendant did have the information (from its pre-contract test borings) which it failed to reveal to the plaintiff, as it should have. The result, plaintiff charges, is that it expended over $600,000 in extra removal of waste materials for which it has not received recompense. The short of our decision rejecting the claim is that, assuming that plaintiff was in fact as innocent as it says of the nature and scope of the clay pockets in the mountain, still the Government’s information was available to it and under its contract it was bound to seek that information or to be treated as if it had.
Before the contract was executed, the defendant drilled 33 holes in the mountain to ascertain the character of the underlying material. The defendant then supplied the plaintiff drawings of the profiles (or logs) of these borings, which showed cavities in the limestone formation by solid black markings; there was no statement, however, whether the cavities were open or wholly or partially filled by clay. The actual cores of the borings were retained and were available *362 to, and inspected by, plaintiff. Although defendant vigorously attacks the findings on this aspect of the case, we accept for the purposes of our decision (without deciding or independently finding) the Commissioner’s conclusion that, on the basis of these contract drawings and core-borings (which it admittedly examined) as well as the other facts of which it was aware, plaintiff did not know or have reason to know that such a large part of the subsurface material in Lee Mountain was contaminated with clay (see findings 10, 11, 12, 13, 19, 20, 21, 25, 45 and 51) .[4]
Our problem centers on the fact that the defendant also had field logs, recording the actual findings of the inspectors and geologists, which contained considerably more information than was shown on the contract drawings; from these field logs it is indisputable that it could readily be ascertained that a great many of the cavities shown in the contract drawings were clay-filled. The Commissioner has found as fact, and on a review of the evidence we affirmatively agree, that it was customary to make such field logs; that this was known to plaintiff, composed as it was of businesses experienced in heavy construction; that the field logs were kept at the Corps of Engineers’ field office where the actual boring-cores were on display and inspected by plaintiff’s representatives; that had plaintiff asked to see these logs they would have been permitted to do so (although defendant would have disclaimed any responsibility for plaintiff’s reliance on the contents of the logs); and that the field logs, which distinguished between open cavities and those containing clay, revealed that very large parts of the cavities encountered in the borings and shown on the contract drawings were filled to some extent with clay.
Was plaintiff bound to ask for these field logs located in the nearby Government field office ? Ata pre-bid conference, *363 plaintiff was informed in writing that “[r]esults of explorations and tests, including core from some of the borings, are available at the Bull Shoals sub-office, Mountain Home, Arkansas.” Section SC-12 of the contract specifications similarly provided that the “results of all borings and tests, including samples of core, which have been made by the Government, of the materials contemplated for use under these specifications are available at the Bull Shoals suboffice, Mountain Home, Arkansas, for examination by the bidders.”[5] The contract also contained the usual warning and exculpatory provisions requiring the contractor to investigate conditions for itself (including the “character, quality and quantity of surface and subsurface materials to be encountered”) and providing that “any failure by the contractor to acquaint [itself] with all the available information concerning these conditions will not relieve [it] from responsibility for estimating properly the difficulty or cost of successfully performing the work” (see finding 6). Significantly, the contract contained no clause relating to changed sub-surface conditions.
We have concluded that this general phrase “results of all borings and tests, including samples of core” — appearing in the specifications — covered the field logs, and therefore that plaintiff is charged with notice of the information appearing in those documents. Plaintiff knew, as we have found (finding 17), that it was customary to make field logs. From the experience of the joint venturers with the Norfolk and Bull Shoals projects, the plaintiff also knew that the Little Bock District Engineer Office had previously made such logs available and had described them as “logs of these explorations”, “logs of the core borings”, “records of the drilling”, “logs of individual test holes”, or “logs of borings.” These terms are very close to the somewhat broader phrase used in the present contract, and it is natural to read the new phrase as having at least the coverage of the old. The contract drawings, or contract logs as they have sometimes been called, wei’e already furnished to plaintiff, and therefore *364 ■could not have been the “results of all borings and tests” which were to be made available on request. The actual physical cores were certainly within that designation, but they could not have been the only materials meant to be ■covered since the specification expressly declared that they were included within the wider term “results of all borings .and tests”, or the phrase “results of explorations and tests” (as the pre-bid information bulletin put it).[6] Some additional' information relating to the test borings was undoubtedly included. Plaintiff’s evidence is that the only ■extra materials it understood the phrase to cover were laboratory reports on the rock to determine its acceptability, but a Government witness testified specifically that the phrase also included, and was understood as including, the field logs. Particularly in the light of the general contractual clauses ■counseling the contractor “to acquaint himself with all the available information” concerning the conditions to be encountered (including “the character, quality and quantity of surface and subsurface materials”), it is fair to read “results ■of all borings and tests” broadly rather than narrowly.[7]
Giving weight to all of these elements, we believe the correct interpretation of the inclusive words, “results of all borings and tests”, is that they encompass the field logs which were customarily made in order to report on test borings, which had been specifically available on the earlier companion projects in which the plaintiff’s parents had participated, and which would have been been made available here on request. Accordingly, the plaintiff was told by the contract, properly read, where it could obtain from the Govem *365 ment the very information which it says was withheld to its-detriment.
Even so, plaintiff urges, the defendant is liable because a contractor is entitled to rely on definitive representations in the contract papers themselves, such as the contract drawings-in this case, and is not required to search further for the true facts. The cases do hold that the. Government is liable for-damage attributable to misstatements of fact (in a contract or specifications) which are representations made to the contractor.[8] The cases also hold that, in such circumstances,.. the defendant is not relieved from liability by general contractual provisions requiring the bidder to investigate the-site' or satisfy himself of conditions, or stating that the-United States does not guarantee the statements of fact in the specifications, etc.[9] But the cases do not hold that a bidder can rely on some portion of. the information supplied by the Government without looking at other Government materials (to which he is directed by the contract documents-themselves) which qualify, expand, or explain the particular-segment of information on which the contractor intends to-rely. The offer of the “results of all borings and tests”,. i.e., the field logs, was as much a part of the contract papers, as the profile drawings of the holes which had been bored. In this context as well as others, “the court is.required to-examine the entire contract * * United States v. Stage-Company, 199 U.S. 414, 423 (1905).
^Recognizing this principle, the court has refused recovery — in cases akin to the present one, although not precisely in point — to contractors who sought to rely on an-alleged misrepresentation in one part of a contract even though they were guided by the contract documents to-sources which would have revealed the whole truth. In General Contracting Corp. v. United States, 88 Ct. Cl. 214, *366 247 (1939), the contractor, who found rock which was laminated and water-bearing, claimed to have been misled because the Government drawings indicated “solid limestone”; however, the specifications advised bidders “to examine the cores and to judge for themselves the character of the materials to be ’.eneauntePed.” The court - denied recovery, saying that “while tlxé drawings did not disclose á -‘seamy, laminated, or broken condition’, the borings did. We have no record showing that the drawings were false so far as they went.” Similarly, in plaintiff’s case, while the drawings did not indicate that the cavities were clay-filled, the field logs did, and the drawings, though incomplete, were not false “so far as they went”; the plaintiff was in effect told to look at the field logs for the full story. In C. W. Blakeslee, & Sons, Inc. v. United States, 89 Ct. Cl. 226, 246-47 (1939), cert. denied, 309 U.S. 659 (1940), the contractor chárged that it was deceived by the wash-boring maps to believe that there were no significant boulders in the subsurface area; the contractor failed to consult the boring logs, which were available, and therefore did not gather, since it looked at the wash-boring maps alone, that boulders existed and dynamite was used to get by them. “The method of making the borings and the fact that dynamite was used and similar information is recorded in the log book. Plaintiffs knew this but made no effort to consult the log book, which was available to them. Plaintiffs therefore have no one but themselves to blame for the fact that at the time they submitted their bid they did not know that dynamite had been used by the defendant an -making-.the.borings and-cannot be heard to complain that they were misled or damaged by the defendant because of that fact.” In Archie and Allen Spiers, Inc. v. United States, 155 Ct. Cl. 614, 296 F. 2d 757 (1961), the contract warned the bidder to “verify all dimensions and conditions at the site”; these special warning clauses were held applicable to a contractor who failed to check the typical measurements shown on the drawings. See, also, Central Dredging Company, Inc. v. United States, 94 Ct. Cl. 1, 11, 13 (1941); Trimount Dredging Co. v. United States, 80 Ct. Cl. 559, 574-75 (1935); Nelson Construction Co. v. United States, 91 Ct. Cl. 476, 486 (1940), cert. denied, 312 *367 U.S. 696 (1941). In all of these cases, no doubt, there, existed some other particular factor, in addition to the contractor’s failure to seek information open to him under the contract, which entered into the court’s ruling against the claim of misrepresentation, but we think the fair residue of the opinions is that a contractor cannot' call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitation to hid. As we read them, the decisions of the Supreme Court and of this court do not permit the contractor to rest content with the materials physically furnished to him[10]; he must also refer to other materials which are available and about which he is told by the contract documents.
That principle squarely applies here. If the Flippin contract had used the more explicit words of the Norfolk Dam or Bull Shoals Dam documents — “logs of individual test holes” or “the records of the drilling” may be seen at the District Engineer’s Office — the plaintiff would certainly have been required to look at those records. As we have said, the comparable phrase “results of all borings and tests” has at least the same breadth in this case. Plaintiff was not excused from examining the logs because the Government’s representatives would have disclaimed any responsibility, under the general contract provisions telling the contractor to investigate for itself, for plaintiff’s reliance on the logs’ contents; such oral observations, simply reiterating the standard clauses, could not affect the contractor’s, obligation to acquaint itself with the pertinent materials, or its rights if it was in fact misled by that information. Plaintiff has given us no persuasive reason for avoiding the consequences of its failure to ask for the field logs.
Belatedly, plaintiff argues, in the alternative, that, even if it cannot show misrepresentation, it is entitled to recover on the ground that both parties were mistaken as to the *368 quantity of stripping and waste that would be encountered! and the availability of a sufficient quantity of acceptable' rock in a sidehill operation (rather than digging into the-crest of Lee Mountain). Plaintiff estimated, it says, that 1,000,000 cubic yards of stripping and scalping material would be wasted; the defendant’s pre-contract estimate of waste was 1,165,000 cubic yards; the actual amount wasted, turned out to be 2,763,067 cubic yards. The Commissioner has also found — and for this decision we assume the correctness of these findings — that both parties originally contemplated a sidehill operation and that in the course of performance plaintiff changed (with defendant’s approval); from a sidehill operation to an operation at the- crest, be1cause it believed that much more waste would result from continuing to work at the side. These facts do not warrant reformation of the contract for mutual mistake.
There are many contract misapprehensions, common to: both parties, which fall short of requiring reformation. See-V Williston, Contracts (rev. ed.), Secs. 1538, et seq. In particular, a mutual mistake as to a fact or factor, even a material one, will not support relief if the contract puts the-risk of such a mistake on -the party asking reformation (United States v. Hathaway, 242 F. 2d 897 (C.A. 9, 1957)), or normally if the other party, though made aware of the correct facte, would not have agreed at the outset to the change now sought (Williston, supra, Secs. 1547, 1548, 1549). Both of these conditions are present here. The elaborate-contract provisions on “Site Investigation and Representations”,[11] together with the omission of the usual changed *369 conditions clause, show that the risks of mistakes as to subsurface materials were deliberately placed on the plaintiff ; in the absence of misrepresentation, the contractor was to be bound , by what he met during performance. United States v. Hathaway, supra, 242 F. 2d at 899-901; American Elastics, Inc. v. United States, 187 F. 2d 109, 112, 113 (C.A. 2, 1951); see also footnote 7, supra. Moreover, there was no misunderstanding, on the Government’s part as to what plaintiff might have to do to fulfill the contract at the •specified prices. As the Commissioner has found without dispute, the defendant contemplated a sidehill operation but •did not require it.or put another method out of mind (seé findings 23, 25, 30, 35, 51)[12]; and there is little reason to believe that, even if the Government had known in advance that 2,763,067 cubic yards of material would be wasted, it would have agreed to increase the plaintiff’s compensation. Plaintiff’s total bid price was considerably higher than the Government’s estimate of total costs, and the defendant viewed plaintiff’s bid as excessive. Agreement was ultimately reached through the adoption of a contract term (article 29) accepting plaintiff’s bid prices but also providing that if those unit prices were higher than actual costs the difference would be divided equally between the parties. Despite the additional work for which it now sues, plaintiff admittedly made á substantial profit' on the contract (see finding 57). Its total adjusted contract price amounted to $10,386,935.86; its “adjusted cost” (including all applicable contract expenses plus 2 per cent for home office overhead and 10 per cent profit) totaled $8,697,306.85. Its additional net income thus came to $1,689,929.01, which was reduced by one-half under article 29, leaving $844,814.50. In this set of circumstances, we can find no material mistake which *370 should lead to reformation of the contract. Plaintiff is entitled to recover neither for misrepresentation nor on the basis of mistake.
The defendant has interposed a counterclaim only remotely connected with the plaintiff’s claim but very closely related to our recent ruling in Ozark Dam Constructors v. United States, 153 Ct. Cl. 120, 288 F. 2d 913 (1961). In the course of construction of the Bull Shoals Dam by the present joint venturers (using the name Ozark Dam Contractors), a railroad strike for a time prevented the defendant from supplying the cement which it had agreed to furnish for the project, thus interrupting the contractor’s work and increasing its costs. Ozark Dam Contractors sued for damages, and after a trial the court denied recovery, holding that (a) the defendant’s representatives were not negligent in dealing with the problems raised for the contractor by the strike, and (b) the contractor was not entitled to an “equitable adjustment” of the price, under a contractual provision relating to suspension of work for the convenience of the Government, because the work was suspended, not for the Government’s convenience, but because of a railroad strike which the defendant did not cause or desire.
The present contract was tied to the Dam project since the rock aggregate was to be delivered to Bull Shoals for mixing with cement to make concrete; the interruption in Bull Shoals work was reflected in a delay in plaintiff’s work. The joint venturers’ contract now before us, under the name of Flippin Materials Company, contained a similar clause for suspension of work for the convenience of the Government, as well as for an “equitable adjustment” in case of an unreasonably disrupting suspension of that kind. After the strike stopped deliveries of cement to the Dam project, this plaintiff requested such a suspension order and an equitable adjustment. The contracting officer denied the request, but on appeal the Corps of Engineers Claims and Appeals Board held that an appropriate price adjustment should be made. Under this ruling, the contracting officer issued a change order modifying the contract price to add $83,478.17 “as complete compensation for the delay resulting from the strike of the Missouri Pacific Kailroad.” Deducting half of this sum under article 29 of the contract (mentioned above), the *371 defendant paid plaintiff $41,739.08. It now counterclaims to recover that sum on the ground that the Claims and Appeals Board erred as a matter of law in holding that the work-interruption was for the convenience of the Government.
This precise point was upheld by the majority of the-court in the Ozark Dam Constructors opinion. Applying a suspension provision identical with that set forth in the present contract, the court ruled flatly that the clause was inapplicable and that the work had not been suspended for the convenience of the Government. See 153 Ct. Cl. at 130, 288 F. 2d at 918-19. Although all members of the court did not agree with that conclusion, we feel that it should be followed in a case so nearly identical in parties, facts, and contract provisions. In all probability, the present joint ven-turers, being the same individuals and entities involved in the earlier case (though acting under a different name), are collaterally, estopped by the prior judgment. Cf. Sucesores de L. Villamil & Co., S. en C. v. Merced, 239 F. 86 (C.A. 1, (1916); United States v. Moser, 266 U.S. 236, 242 (1924); Hansberry v. Lee, 311 U.S. 32, 42-43 (1940); Associated Oil Co. v. Edgerton, 77 P. 2d 416-17 (Ore., 1938). In any event, the prior decision is a recent precedent, on a very special set of circumstances, which is as close as can be to the present case. We decline to reconsider the issue anew; we adhere, rather, to the 1961 ruling of this court as settling the point. Cf. Lincoln Nat. Life Ins. Co. v. Boosth, 306 F. 2d 110, 112-14 (C.A. 5, 1962).
It makes no difference that in this instance the Claims and Appeals Board held for the contractor, while it rejected the claim in the companion case. The court’s express ruling in Ozark Dam Constructors was that, as a matter of law, the contractual provision upon which the board relied could not be read so as to sustain an “equitable adjustment.” A holding of a contract appeals board which is erroneous in law has no binding effect. The contract modification resulting from the board’s decision can have no higher status; unsupported by the framework of the contract or by any new consideration, the modification was void as an unauthorized gratuity without consideration. See, e.g., Burke & James, Inc. v. United States, 63 Ct.Cl. 36, 56-57 (1927). Under familiar principles, the Government is entitled to recover a payment *372 made through an error of law. E.g., Wisconsin Central Rd. Co. v. United States, 164 U.S. 190, 210 (1896); Milwaukee Engineering & Ship. Co. v. United States, 129 Ct. Cl. 167, 175-76, 121 F. Supp. 922 (1954).
For these reasons, plaintiffs is not entitled to recover on its "claim but the defendant is entitled to recover on the counterclaim. The petition is dismissed and judgment will be entered for the defendant for $41,739.08 (the sum received by the plaintiff under the contract modification involved in the counterclaim).
Durfee, Judge; Laramore, Judge'; "Whitaker, Judge; and Jones, Chief Judge, concur.
findings of fact
For the limited purposes of its decision herein,[13] the court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett,- and the briefs and arguments •of counsel, makes findings of fact as follows: •
1. Plaintiff, Flippin Materials Company, of Houston, Texas, is, and was at the times hereinafter stated, a joint venture composed of Brown & Root, Inc., a corporation of the State of Texas; Wunderlich Contracting Company, a corporation of the State of Nebraska;[14] Peter Kiewit Sons Company, a corporation of the State of Nebraska; Winston Bros. Company, a corporation of the State of Minnesota; David G. Gordon, a citizen of the United States and a resident of the State of Colorado; Fred B. Schultz and Chester W. Cunningham, citizens of the United States and residents of the State of Nebraska, co-partners trading under the firm name of Condon-Cunningham Co.; Morrison-Knudsen Company, Inc., a corporation of the State of Delaware; J. C. Maguire and Constance S. Maguire, citizens of the *373 United States and residents of the State of' California and Constance Smnrthwaite Maguire Trust, Marie F. Monahan Trust, Alice L. Maguire Trust, Nell L. Maguire Trust,. Constance Patricia Maguire Trust and Frances D. Maguire Trust, all of the State of California, co-partners trading under the firm name of J. C. Maguire & Company, and Chas. H. Tompkins Company, a corporation of the District of Columbia.
2. The joint venture was formed by plaintiffs for the sole purpose of entering into a supply contract with defendant, acting through the Corps of Engineers, Department of the Army. The contract, No. W-03-050-eng-525, was executed on November 3, 1947. It contained no clause relating to changed conditions. Under the contract, plaintiff, in consideration of the payment of certain unit prices therein, shown below, agreed to furnish all plant, labor, equipment and material, to perform all work necessary to manufacture sand and crushed rock from limestone to be found in a mountain owned by defendant, locally known as Lee Mountain and in the vicinity of Flippin, Arkansas, and to deliver such materials into storage piles at the Bull Shoals Dam site on the White River in Marion and Baxter Counties, Arkansas, for use in the concrete required for the construction of that dam. The work was all required to be done “in strict accordance with the specifications, schedules and drawings” made a part of the contract.
Schedule A of the contract listed the following items, quantities and prices:

*374 3. All members of the co-venture were experienced in' the field of heavy construction, and many of them had previously operated quarries. In addition, plaintiff engaged as superintendent of the project, Mr. Harvey Slocum, who served in this capacity from the beginning of the work. Slocum possessed wide experience and a very high reputation in the construction industry. When employed by plaintiff he had been engaged in the construction industry for approximately 40 years, during which time, as superintendent, he had built approximately 13 dams, including projects of such magnitude as the Grand Coulee Dam on the Columbia River. In addition, he had gained considerable experience in the operation of quarries, including those which had produced aggregates for concrete used in the construction of dams.
4. Mr. Ross White, representative of the sponsor of the project, Brown & Root, Inc., also had been engaged in the construction industry for approximately 40 years, and during that time had been associated with the construction of some 13 dams, including responsibility as general superintendent over all construction work for the Tennessee Valley Authority in the years 1933 to 1937. In connection with the various projects with which he had been associated, White had also gained experience in the development and operation of some seven quarries; four of which had been in limestone formations.
5. The invitation for bids was dáted August 29, 1947. It was received on or about September 1, 1947, by plaintiff’s sponsor, Brown & Root of Houston, Texas, and contained the specification for furnishing the concrete aggregates. The invitation recited that sealed bids would be received until 2 p.m., September 23, 1947, and required that bidders furnish specified data with respect to their proposed work and equipment.
S. The specifications provided in part:
GC-2 Site investigation and representations. The contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, and roads, uncertainties of- weather, river stages, tides *375 or similar physical conditions at the site, the conformation and condition of the ground, the character, quality and quantity of surface and subsurface materials to be encountered, the character and equipment and facilities needed preliminary to and during the prosecution of the work and all other matters which can in any way affect the work or the cost thereof under this contract. Any failure by the contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the negotiation and execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is assumed by the Government. [Representations made but not so expressly stated and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the contractor and the Government will not be liable or responsible therefor.
GC-3 Operations and storage areas.
a. All operations of the contractor (including storage of materials) upon Government premises shall be confined to areas authorized or approved by the contracting officer. * * *
* * * * . *
SC-5 Contract drawings, maps, and specifications. Five sets of contract drawings, maps, and specifications will be furnished the contractor without charge. Additional sets will be furnished on request at the cost of reproduction. The following contract drawings and maps, Serial 5683, all of which form a part or these specifications, are available in the Office of the Corps of Engineers, War Department, 300 Broadway, Little Kock,. Arkansas.

Sheet lío. Title File No.

Location Map and Index_ 139/691 H
Location Map_ 139/692 eq
Processing and Storage Area-_ 139/693 05
Quarry Explorations_ 139/694 •<*<
Logs-i.__;— -‘___ 139/695 1©
sje ‡ #
SC-9 Physical data. The information and data furnished or referred to below are not intended as rep- *376 reservations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for the accuracy thereof or for any deduction, interruption or conclusion drawn therefrom by the contractor.
' * * * * *

c. Transportation.

(1) General. — The Bull Shoals dam site is served by a construction railroad which is under the jurisdiction of the Ozark Dam Constructors and connects with the main line of the Missouri Pacific Railroad at Cotter, Arkansas. The contractor shall make his own investigation as to the availability of these facilities for transportation of aggregates. The Ozark Dam Constructors, however, will render services for all materials or equipment, except concrete aggregate, at the fixed charge of nine dollars ($9.00) for each car handled. The method of transportation, as well as the furnishing, construction and maintenance of any and all facilities, installations or equipment required for the loading for transportation of aggregates at the quarry site, and for transporting aggregates from the quarry site and placing same into designated storage piles at the dam site shall be the responsibility of the contractor.
(2) Roads. — The contractor shall make his own investigation of available roads for transportation, of load limits of bridges on the roads, and of other road conditions affecting transportation for personnel, materials, or equipment to or from the site of the work. The contractor shall maintain all roads used by him, except state highways in the vicinity, provide, construct, and maintain all other, roads necessary to reach the various parts of the work, and for all the contractor’s transportation requirements. The contractor shall allow such use of bridges and roads constructed by him as the contracting officer and his representatives may require for access to the various parts of the work; and shall further allow such use to others who have a legitimate interest in the project, provided such use, in the opinion of the contracting officer, will not interfere with the prosecution of the work under this or other Government contracts.
ijs s}< Jf:
SC-11 SUPERVISION" AND INSPECTION. The work will be conducted under the general supervision of the contracting officer and the aggregates supplied under these specifications will be inspected and sampled at the producer’s plant and/or at the project site storage piles *377 by- bis appointed inspectors to insure strict compliance with the provisions of these specifications. The contractor shall furnish the contracting officer or his authorized representatives all the facilities necessary for proper inspection and sampling of the aggregates. Such facilities shall include a weatherproof room approximately 12' x 16' equipped with adequate heat, light and electric power facilities suitable for housing and operating equipment for acceptance tests.
SC-12 Quarry
a. General. — The contractor shall procure materials from which the aggregates are to be manufactured from the quarry area designated on the drawings as the Flip-pin quarry area in the Everton limestone formation near Flippin, Arkansas. There is available within the designated area and within the approved limits, shown on the drawings, an adequate supply of material from which fine and coarse aggregate meeting the requirements of Part IV of these specifications can be manufactured. The right is reserved, however, to reject certain localized areas, strata or channels within the approved area and zone when, in the opinion of the contracting officer, the material has disintegrated, weathered badly or is otherwise unsatisfactory for use in the structures under consideration. The results of all borings and tests, including samples of core, which have been made by the Government, of the materials contemplated for use under these specifications are available at the Bull Shoals Suboffice, Mountain Home, Arkansas, for examination by the bidders.
* * * * #
e. Operation. — Primary crushing and scalping shall be done at the quarry. The product of the primary crusher shall be screened to remove objectionable shaly material and thin, flat, elongated particles not suitable for further processing. Aggregate within the approved area and zone which has disintegrated, weathered badly or is otherwise unsatisfactory shall not be used. Aggregate processing into the various required sieve sizes shall be done at the dam site. The methods employed in the quarrying and processing of the material shall be subject at all times to the approval of the contracting officer.
d. Overburden and Waste Material. — The contractor shall select waste areas convenient to the quarry operations and within the limits of the Government-owned land for the deposition of overburden, rejected, and scalped materials. The waste areas shall be approved by the contracting officer and before commencing any *378 quarry operations the waste areas and the quarry site shall be cleared of all trees, brush, and other objectionable debris which shall be disposed of by burning or as otherwise approved by the contracting officer. Stumps shall be removed to within 2 feet of the ground. Overburden and waste material placed in an approved waste area by the contractor, at the direction or with the approval of the contracting officer, will be paid for at a fixed price of 30 cents per cubic yard, measured by cross-sectioning the waste area after clearing operations and again after waste operations are completed. No waste material will be paid for unless placed in an approved waste area by the contractor. No separate payment will be made for clearing but the cost thereof shall be included in the items of work of which clearing is a part.
$ Sic sji $ $
Part IV
TECHNICAL PROVISIONS
TP-1 FiNE aggregate.
a. Composition. — Fine aggregate shall consist of manufactured sand.
b. Quality. — Fine aggregate shall consist of hard, touch, durable, uncoated particles. Manufactured sand shall be produced by a dry process and with equipment especially designed for producing the particle shape and gradation required. The shape of the particles shall be generally rounded or cubical and reasonably free from at and elongated pieces. The particle shape shall be similar and equal to the samples of the commercially manufactured sand from Bull Shoals Mountain (40" Calyx Core, Q,-13) which are on display at the Office of the District Engineer and the Bull Shoals Suboffice. Rock which breaks down into thin, flat, elongated particles, regardless of the type of processing equipment used, will not be approved for use in the production of fine aggregate. A thin, fiat, elongated particle is defined as a particle having a maximum dimension in excess of five times the minimum dimension. The fine aggregate shall conform to the following specific requirements: ‡ $ $ $ $
c.Storage. — Fine aggregate shall be stored in such a manner as to avoid the inclusion of any foreign materials and so as to prevent segregation. The deposition of the material in storage shall be done in such a manner as to result in increasing the uniformity of the grading inso- *379 ' far' as is practicable. Sufficient live storage shall be maintained at all times as specified in Paragraph SC-1 d.
TP-2 Coarse aggregate.
a. Composition. — Coarse aggregate shall consist of crushed stone.
b. Quality. — Coarse aggregate shall consist of hard, tough, durable and uncoated particles. The equipment and plant used in the production of coarse aggregate shall be designed for the production of aggregate conforming with the requirements of these specifications The particle shape of the smallest size of crushed coarse aggregate shall be generally rounded or cubical, and the tolerance on fiat and elongated particles in all sizes of the coarse aggregate shall be governed by the inherent placeability requirements of the structure in which the mixture is to be placed. A thin, flat and elongated particle is defined as a particle having a maximum dimension greater than five times the minimum dimension. The _ coarse aggregate shall conform to the following specific limiting requirements:
❖ * • # H ÍÜ ¡J;
o. Storage. — Coarse aggregate storage piles shall be built in such a. manner as to avoid the inclusion of any foreign material and to prevent segregation and excessive breakage. Bock ladders of satisfactory design shall be used with conveyor systems. Sufficient live storage shall be maintained at all times as specified in Paragraph SC-1 d.
# ' * . * # #
7-, Defendant conducted exploratory investigations at seven locations before selecting Lee Mountain, about 7 miles from Bull Shoals, on August 8, 1947, as the quarry site. Between May 25 and August 25, 1947, defendant drilled 21 holes at the selected site. Defendant subsequently drilled another 12 holes, Nos. 22 through 33, following a prebid conference held on August 26, 1947. The last of these supplemental borings was completed by defendant on September 3 or 4, 1947. They were drilled lower on the mountainside. All holes were bored in an attempt to ascertain whether there existed at the site a sufficient quantity and quality of acceptable rock and to indicate a general picture of subsurface conditions within the area explored. The profiles *380 or logs of the core boles were shown on contract drawings which contained several notes, including the following:
1. The right is reserved to reject certain localized areas, strata or channels within the approved area and zone when, in the opinion of the contracting officer, the material has disintegrated, weathered badly or is otherwise unsatisfactory for use in the structure under consideration.
¡8. The limestone formation designated as the “A” zone on the contract drawings and from which the material here was to be quarried, consisted of the Everton formation of the Ordovician Age. This formation was a massive and thick-bedded dolomitic limestone with some thinner beds of sandy limestone and sand. “Massive limestone” indicates that the bedding planes dividing the rock are relatively far apart and the term “thick-bedded” as used in geology describes rock in beds where the vertical distance between bedding planes is measured in feet. Overlying the Everton formation was the Boone formation of the Mississippian Age. The Boone formation was not included in the A zone of acceptable rock at the beginning of the contract, but a portion thereof was later included by modification as hereafter reported.
0. Limestone is a soluble rock which commonly possesses cavities as a result of the chemical action of water upon the stone millions of years ago. This is the case in the area of Bull Shoals Dam and Flippin quarry. Plaintiff’s experience had indicated that cavities in a limestone formation may be open, filled or partially filled with clay or sand which comes in from the overlying formation. The Everton limestone itself would not have a clay content exceeding 5 percent. Additional clay would have to wash in from elsewhere if it appeared in cavities in this formation. This is a common but not universal occurrence. The existence of such clay and cavities is commonly sought as among the things to be determined by drilling.
10. Because of the wording of paragraph GC-2 of the specifications, plaintiff’s representatives visited the site of the quarry prior to submission of bids. Examination of the terrain disclosed location of the drill holes shown on the contract drawings. Lee Mountain was covered by a forest *381 and a heavy layer of residual clay up to 65 feet thick at the top. The clay was evident along the road and there were occasional weathered outcroppings of stone. There were no bluffs on the mountain, the contours of which were fairly smooth. There were no sinkholes. One qualified witness estimated that the clay mantle on the mountain had been accumulating over a period of about 60 million years while a thousand feet or more of rock had eroded from above the proposed quarry site. One of defendant’s witnesses described the mountain as a “sorry looking quarry site.” An ideal quarry site is one readily accessible with a bluff of sufficient length to warrant opening a quarry. The bluff at an ideal site would be exposed so that the whole section could be examined and a minimum of overburden removed. Defendant’s witnesses testified that the conditions at Lee Mountain should have alerted plaintiff to the strong possibility that subsurface conditions would be affected by seepage of clay from the heavy layer of it above; However, plaintiff made no such conclusion and in bid preparation relied upon the log profiles on the contract drawings and the physical cores for an indication of subsurface conditions. To this information was added an evaluation based on the long experience plaintiff’s representatives had in the construction industry.
11. Part of plaintiff’s experience was that of the co-ven-turer, Morrison-Knudsen, in helping to build the Norfork Dam under a contract with the Corps of Engineers, Little; Rock District, just prior to construction of the Bull Shoals Dam for which the quarry here in issue was opened by plaintiff as a source of aggregates. ■ The two dams were about 20 miles apart and Norfork Dam was approximately 30 miles from Lee Mountain. Some cavities were encountered at Norfork in both the Powell and Everton limestone formations. Some of these cavities contained clay. The contract boring logs at Norfork showed this condition as did those contained in the contract drawings for the Bull Shoals Dam. The contract drawings for the quarry on Lee Mountain, however, while indicating cavities, did not say whether cavities there were open, clay-filled or partly clay-filled. The legend appearing on the contract drawings opposite the bor *382 ing logs described tbe A-zone material as “limestone, hard to very hard, dense to crystalline, sandy seams and zones.” Presence of such seams and zones of sand, while an unsatisfactory material for concrete aggregate, would raise no serious obstacle to the performance of the work, because, unlike the clay involved in this case, sand has no plasticity and will not adhere to rock when it is blasted. Absent any qualification on the drawings or in the specifications as to the cavities, plaintiff concluded they contained insignificant amounts of clay. Deference will be made hereafter to an indication of clay in the field logs and core borings which were results of explorations defendant contends were available for plaintiff’s inspection at the Bull Shoals suboffice and which plaintiff was obligated to examine under paragraph GC-2.
12. In preparing their bid and in evaluating the boring logs contained in the contract drawings for the quarry, the co-venturers also relied upon their previous experience in bidding on the Bull Shoals Dam contract, the project for which they were to manufacture the concrete aggregates under the contract here in suit. Contract drawings for the dam and for the quarry were both prepared and issued by the Little Kock district office of the Corps of Engineers. The dam was constructed in a dolomite rock formation belonging to the limestone family, very similar to limestone and to the formations at Lee Mountain. As noted in the finding above, boring logs for the dam clearly indicated to bidders the presence of subsurface cavities which were described as either open, clay-filled or partially clay-filled. According to the legend appearing on those drawings, a solid black area was to indicate the vertical extension of an “open” cavity. This solid black symbol on the boring logs on the drawings was described by the legend as meaning “empty.” The boring logs for the dam, however, under “General Notes” carried the statement “5. Cavities shown ‘open’ probably have a soft clay filling.” This note also appeared on the contract boring logs for the Norfork Dam. Known clay-filled cavities were symbolized by a cross-hatched area on the boring logs. Where cavities were known to be partially clay-filled defendant used a solid black symbol to indicate the open portion and the cross-hatched symbol to indicate *383 the clay area. The drawings of boring logs for the Bull Shoals Dam were dated March 19, 1945, which was about 2y2 years prior to the time bids were received for the quarry contract on September 23, 1947. Bids were invited for the quarry about 4 months after they were received on the dam. Plaintiff concluded that, where a cavity was indicated by a solid black symbol in the contract boring logs for the quarry, it was intended to represent an “open” cavity as in the case of the dam. Further, plaintiff understood that a “cavity” in common English usage means an “empty” or “hollow” place, and that the term has no special or technical significance in the construction industry. However, the solid area on the Flippin quarry contract drawings designating “cavity,” was not accompanied by the legend “open”; neither did the drawings carry any suggestion that there might be á soft clay filling in any cavity area. These differences did not suggest to plaintiff the danger of clay-filled cavities in the quarry area as the physical cores did not demonstrate what plaintiff considered a significant amount of clay. Plaintiff concluded that after stripping the unsuitable mate-” rial above the A zone of acceptable rock, no particular difficulty would be encountered in performing the work.
13. The evidence does not demonstrate that the contractor attached importance to the name of the formation from which materials were to be excavated at any of the sites referred to in the finding above or that the contractor was aware that clay had been encountered in the Everton formation at Norfork. Further, when the contract boring logs were prepared for the Flippin quarry at Lee Mountain it was not known to defendant that Morrison-Khudsen would be a bidder or a member of the joint venture awarded the instant contract. It is found that to a prospective bidder and to a contractor it is just as important to know whether there is clay in a cavity in a formation to be opened as a quarry as it is in a similar formation in a dam foundation. The reasons for this differ but the results of the absence of such knowledge would be directly reflected in performance, time, difficulties and costs.
14. There are issues of fact as to whether defendant made available to plaintiff all available information it had con- *384 ceming the conditions of the job prior to bids, and whether plaintiff fulfilled its responsibility to acquaint itself with these conditions as required by GC-2 of the specifications quoted in finding 6. The available information concerning the “character, quality and quantity of surface and subsurface conditions to be encountered” included, as stated in paragraph SC-12, also quoted in finding 6, the following:
* * * The results of all borings and tests, including samples of core, which have been made by the Government, of the materials contemplated for use under these specifications are available at the Bull Shoals Suboffice, Mountain Home, Arkansas, for examination by the bidders.
15. Prior to issuance of the invitation for bids, a prebid conference was held on August 26,1947, at the district office of the Corps of Engineers at Little Rock. Defendant’s representatives were there and various prospective bidders including plaintiff’s originators. The purposes of the conference included providing prospective bidders with certain preliminary information concerning the project as well as a chance to talk with the contracting officer and his staff about the work and the provisions of the proposed specifications. Defendant distributed to the conferees a bulletin containing proposed specifications, maps and data about storage and processing areas. The bulletin, entitled “Advance Information Concerning Furnishing Concrete Aggregates,” stated:
2. Results of explorations and tests, including core from some of the borings, are available at the Bull Shoals sub-office, Mountain Home, Arkansas.
It is noted that this is substantially the language later included in SC-12, as quoted heretofore. There is no evidence that the field logs of the borings were mentioned by anyone present or that they were offered to the conferees by defendant or requested by any of the prospective bidders. Plaintiff first saw the field logs in June 1951 during the administrative hearing. Core borings were a subject of discussion and the possibility of making additional borings was considered. Plaintiff understood that the “results of explorations and tests” related only to the laboratory reports bn the rock to determine its acceptability, the physical rock *385 cores recovered 'by defendant during drilling, cores to be obtained later as a result of the conversations at the prebid conference and the boring logs as they would show on the contract drawings based upon defendant’s explorations of the site and recorded in field logs. Defendant’s geologist testified at the trial that he would expect no major discrepancy between the field logs he prepared and the contract drawings but recognized, prior to the bids, that the field logs referred to clay, whereas the boring logs on the contract drawings based upon his field logs did not refer to day. He attached no importance to this as it was his experience that cavities usually contained clay. The drawings showed cavities, the cores showed clay, and plaintiff’s representatives inspected both the cores and the drawings. He concluded further that he was available to answer questions of the bidders. The contract drawings were furnished to bidders and were available at the Little Rock office of defendant, as stated in paragraph SC-5 of the specifications.
16. The field logs contain the record of site explorations by the drillers and are recorded by an inspector or geologist, finalized by the geologist, and used in preparation of contract drawings. They contain more information than it is sometimes practical to show on the drawings. They reflect the actual detailed conditions found in drilling operations, such as when drill water was lost, when the drill went from hard to soft rock, when chert was encountered in limestone and when clay was encountered. Sometimes the clay would not be recovered in the core extracted from the earth as it is more difficult to recover than stone. The field logs were not specifically identified as such in the specifications, contract drawings or invitations for bids. It is defendant’s position here that field logs are customarily made on a project of this kind, that this was well known in the industry and to plaintiff, that they were available for inspection by plaintiff, and that they were sufficiently identified by the language “results of all borings” and “results of explorations” set forth in the advance information bulletin and in paragraph SC-12 quoted above. Plaintiff denies this and the importance of it in this case is in the fact that, as previously found, the boring logs on the contract drawings for the quarry at Lee Mountain *386 • did- not show whether cavities in the limestone were empty, day-filled or partially clay-filled.
• The field logs contained evidence on existence of clay, which was a vital fact plaintiff needed to know. This clay, adhering to the limestone when it was blasted, complicated the job and has resulted in this lawsuit, as more fully explained hereafter.
17. Plaintiff’s evidence is that .the co-venturers did not know field logs had been made in connection with the instant contract, that where such logs were made it was not customary . for defendant to make them available to prospective bidders, that plaintiff had never known defendant to provide bidders with such logs but, on the contrary, defendant had refused them where asked for and that refusal was on the ground that defendant could not. give one bidder information not given to all. Defendant’s testimony on these contentions was to the contrary, and in support thereof defendant cites contract drawings in evidence on the Norfork Dam, stating:
Logs of individual test holes may be seen in the office of the District Engineer.
Defendant cites, also, a similar document from the Bull Shoals Dam documents, reading in part:
* * * the records of the drilling are available at the office of the District Engineer.
There were no such statements, as quoted above, made orally by defendant’s representatives to plaintiff nor do they appear anywhere in the invitation, contract, specifications or drawings for the Flippin quarry at Lee Mountain. The only language approaching the quotes above is that set forth heretofore in findings 14 and 15. The weight of the credible evidence is that it was customary to make such field logs and that plaintiff knew this. Further, that had plaintiff asked to see the logs, it would have been permitted, but defendant would have disclaimed any responsibility under GC-2 for plaintiff’s reliance upon their contents. The field logs were at the suboffice where the cores were on display and where the cores were inspected by plaintiff’s representatives.
18. The field logs are in evidence. They contain, in the handwriting of the geologists and drilling inspectors, those *387 conditions encountered in drilling each hole. In summary, they reveal that defendant drilled a total of 1,859 linear feet of rock in the 33 borings made at the Flippin quarry site. Therein defendant encountered and recorded 94.4 feet of cavities, representing 5.1 percent of the rock drilled. Out of the total of 94.4 feet of cavities, the defendant’s, field logs report that 77.4 feet, or about 82 percent, of the cavities encountered contained some clay and that 17' feet of open cavities were encountered. In the total of 1,859 linear feet of rock drilled, 1,061 feet were iii the zone which defendant originally considered acceptable for use as concrete aggregate. In the latter measurement defendant encountered 55.8 feet of cavities, representing about 5.2 percent of the rock drilled or roughly the same incidence of cavitation as was found in the total of 1,859 feet of rock drilled. Within the 55.8 feet of cavities in the zone of acceptable rock, 43.2 feet, or 77.4 percent, were clay-filled or partially clay-filled and 12.6 feet of open cavities were discovered. The field logs distinguished between open cavities and those containing clay.
19. Prior to bidding, representatives of plaintiff went to the Bull Shoals suboffice at Mountain Home, Arkansas, to examine the physical cores retained by defendant and mentioned in paragraph SC-12 (a) of the specifications. Approximately 1,600 feet of physical core were available for inspection. This material was in 100 boxes each containing four lines of core, 4 feet long. Some of the cores had been broken and revealed gaps but indicated to plaintiff’s representatives a limestone which they believed would provide excellent concrete aggregates. These representatives testified that they either saw no clay in the cores or that it was insignificant in amount.
,20. Clay appeared in four boxes of cores representing holes numbered 10, 15, 18 and 24. The latter three holes were outside the area in which plaintiff operated. Hole No. 10 was in overburden and not in the A zone. The clay in these cores measured 7.9 feet compared to the total of 1,859 feet of rock drilled. Of the 7.9 feet, a total of 6.9 feet of clay core had been recovered from the 1,061 linear feet of original A-zone rock drilled. Actually, these clay cores were *388 stretched slightly in extraction. This comparatively insignificant recovery of clay in the core borings is at some variance with what the field logs suggest as to the extent of clay in cavities. Correlation of the field logs and cores demonstrates that in the A zone approximately 12 percent of the cavity area contained clay. Plaintiff, of course, did not make any such correlation, not having seen the field logs. Further, the difficulty of recovering clay cores, referred to heretofore, makes the cores themselves an unreliable guide to subsurface conditions, especially when limited in number as here, unless considered in connection with other available information on the subject. It is found that, considered alone, the physical cores in this case did not demonstrate what could have been anticipated fairly as to the extent of clay-contaminating conditions in the quarry or the condition actually encountered by plaintiff.
21. It is not practicable nor customary for bidders on Government contracts to attempt to verify, in advance of bidding, the accuracy of the Government’s subsurface boring by reproducing the same. In this case it would not reasonably have been possible because of the interval of time between the date of the invitation for bids, August 29,1947, and the opening of bids, September 23, 1947. Further, addendum No. 1 to the plans and specifications, which added the log profiles for holes numbered 22 through 33, was not issued until September 5, 1947. Detailed correlation of the data on the contract drawings with the data on field logs or correlation of the core samples with the drawings would have been difficult on account of the shortage of time, and such practice would not have been customary. Plaintiff noted that the disclaimer, paragraph SC-9 of the specifications, did not relate to subsurface conditions as represented by boring data furnished to bidders. There was such a disclaimer as to subsurface conditions in the Bull Shoals Dam specifications.
22. Reference has heretofore been made in findings 7 and 15 to the prebid conference of August 26, 1947, where some of its purposes and results were stated. Another of the things of concern to this conference, attended by representatives of the present parties, was to obtain from prospective bidders *389 their ideas as to how the specifications should be set up and whether any serious difficulties were anticipated. Cross sections and log profiles of explorations already made by the defendant were distributed. No serious difficulty was anticipated for meeting the requirements for fine aggregate. Concern was expressed, however, over the quantity of stripping and unsatisfactory material that might be encountered in developing the quarry. It was suggested that the specifications contain a bid item for stripping. The contract documents as they had been proposed contained neither an estimate of the quantity of stripping likely to be encountered in developing the quarry nor provision for bidding a price for the performance of such work. It was recognized that a large quantity of stripping would be necessary in the performance of the work, the cost of it representing a substantial item in the total cost of the proj ect.
23. The defendant was opposed to permitting the insertion of a bid item for stripping and waste in the contract for fear that defendant might lose control of the quantity involved and this would increase the cost of the project. It was conceivable that a successful bidder might elect to develop the quarry into the crest of the mountain where the overburden was greatest. Defendant was likewise reluctant to provide bidders with an estimated quantity for the stripping to be performed since the quantity would depend on whether the successful bidder followed a crest or sidehill ■operation in developing the quarry.
24. As a result of discussions at the prebid conference, defendant did revise the proposed specifications and inserted therein a fixed price to be paid for all stripping and waste. As thus revised, paragraph SC-12 (d) of the specifications ■provided in pertinent part as follows:
* * * Overburden and waste material placed in an approved waste area by the contractor, at the direction or with the approval of the contracting officer, will be paid for at a fixed price of 30 cents per cubic yard, * * *
This price was admittedly a “shotgun” sort of determination by defendant and intended to defray only a part of the cost. This price, it was expected, would hold to a minimum the amount of stripping and waste that a successful bidder *390 might find" it necessary to perform. The revised contract documents did not give any estimate by defendant as to the quantity of material that a successful bidder might have to handle as stripping and waste. However, as a result of the conference defendant did drill 12 additional core holes lower on the side of Lee Mountain and submitted the results thereof to bidders by addendum No. 1 to the plans and specifications dated September 5, 1947. This additional drilling was referred to in finding 7. The addendum identified additional log profiles prepared in a manner similar to the first group. The addendum did not change the language of the basic specifications such as GC-2 and SC-12 nor did it make any specific reference to field notes from which the log profiles were compiled.
25. The contract drawings provided to prospective bidders contained a topographical map upon which the locations of the core holes were indicated at the quarry site and indicated, where appropriate, the alphabetical cross section or profile drawing upon which the boring log of each hole would be found. Sufficient information was provided thereon to help bidders, together with their own site investigations and consideration of available information, to estimate the quantities of acceptable rock which would be available, as well as quantities of overlying materials which would have to be stripped in order to get to the A zone. The location of the core holes drilled by defendant suggested, but did not require, that a successful bidder might wish to quarry the required rock from a sidehill operation and plaintiff planned to do so. The borings made by defendant were not across the mountain crest.
26. Following inspection of the quarry site, inspection of the physical cores and contract drawings, seven of the nine individual members of the joint venture prepared estimates of the costs which would be experienced in performing the work. No formal estimate was prepared by the Flippin Materials Company as such, the name being first selected about September 21 or 22, 1947. An estimate was also prepared by the construction superintendent of the Ozark Dam, M. H. Slocum. These estimates included all direct and indirect costs and “out-of-pocket costs” of the work and are as follows:
*391 -Charles H. Tompkins Co. (Francis Tompkins)_,-$5,280¡ 000
or
5,660,000
Wunderlich Contracting Co. (Martin Wunderlich)_’ 5,700,000
(E. B. Fontaine)_ 6,011,000
J. C. Maguire & Co. (Maguire)_ 6,010, 780
Winston Bros. Co. (Winston)_¿- 6,101,407
Peter Kiewit Sons Co. (Walter Scott)_ 6,062,000
Harvey Slocum (Ozark Dam Constructors)_ 7,270,000
Morrison-Knudsen Co. (Wilbur & Frein)_ 7,278,000
Brown & Root, Inc. (Ross White)_ 7,310,000
27. The estimates of the members of the venture also varied as to quantities to be stripped, and ranged from 500,000 to 1,000,000 cubic yards.
(a) The Wunderlich Contracting Company estimated that 500,000 cubic yards of stripping and waste would be encountered in performing the work. This was the lowest quantity estimated by any of the joint venturers.
(b) M. H. Slocum, plaintiff’s superintendent, estimated that by a sidehill operation an average of at least 15 feet of overburden and substandard rock would have to be removed to get down to the A-zone rock. He estimated that this would require stripping 600,000 cubic yards.
(c) Peter Kiewit Sons Company estimated that the solid volume of stripping and waste would be 776,347 cubic yards. However, as paragraph SC-12(d) of the specifications provided, stripping and waste material were to be deposited by the. contractor in approved waste areas where it then would be measured by defendant for purposes of payment at the fixed price of 30 cents per cubic yard, and as the quantity of material stripped would have a greater density in its original solid state than when removed and placed in the waste area, Kiewit concluded that a 10 percent swell factor should be included and that the stripping and waste would thus represent 931,200 cubic yards when measured for payment.
(d) Morrison-Knudsen Company, Inc., had two estimates made for it by two different representatives. One of these estimates was for 800,000 cubic yards of stripping and waste and the other was 912,000 cubic yards.
(e) The Charles H. Tompkins Company estimated that 1,000,000 cubic yards would represent the stripping, includ *392 ing an allowance for expansion of the material when deposited in the wastepile.
(f) The estimate for stripping made by the sponsoring member of the co-venture, Brown & Boot, Inc., was made by its representative, Boss White. He concluded that a successful bidder would have to strip 1,000,000 yards of overburden to get to the A-zone rock needed to produce the aggregate specified in the contract. A 16-percent swell factor was used and it was expected that the successful bidder would be paid on a basis of 1.16 cubic yards (1,165,000 cubic yards) in the wastepile. The 1,000,000 cubic yards'were estimated to bear a direct cost of 75 cents per cubic yard, or $750,000. Using the swell factor it was estimated that the contractor would be paid on a basis of 1.16 cubic yards the stun of 35 cents per cubic yard rather than 30 cents so that the net direct cost would be 40 cents per cubic yard, an uncompensated loss of $400,000 after receiving $350,000 under the contract. In addition, a loss of $5,000 for drilling and $5,000 for clearing was expected. This total loss of $410,000 was to be made up by increasing the unit price of the aggregate items.
(g) Communications wei*e put in evidence from other joint venturers indicating that in 1958 they had no records of any estimates and in some cases had never made any independent estimates of stripping quantities and costs.
28. On September 21,1947, some estimators and principals of the joint venture met at the Grady-Manning Hotel in Little Bock, Arkansas, to compare their estimates and agree upon a bid to be submitted to defendant. There is no written memorandum as to what occurred at the meeting but it is clear that up to this point no estimate had been prepared in the name of the Flippin Materials Company. It was at the meeting on this date that the name of plaintiff was agreed upon. Subsequent to the conference of the estimators, but on the same day, the principals met in another room of the hotel and decided that the plaintiff’s contract bid would be $9,301,000, plus the 30 cents per cubic yard for stripping and scalping of an estimated 1,000,000 cubic yards. Bespon-sibility for preparing the finalized bid for submission to the Government was given to the sponsor of the project, Brown *393 & Root, Inc., which had estimated the job at the figure nearest to that eventually adopted in the name of plaintiff. In addition to direct and indirect costs the agreed-upon bid included an amount to cover those contingencies which, in the judgment of the principals, would be encountered in performing the work and an amount representing the profit which the joint venture hoped to realize from the contract.
29. On September 23,1947, when bids were opened, plaintiff’s bid of $9,301,000 was the lowest of the two received by defendant. However, the bid of plaintiff was higher than the defendant’s estimate of $7,636,000 for the cost of performing the work and defendant was unwilling to award plaintiff the contract. That part of defendant’s estimate as to stripping is as follows:
c. Stripping Quarry Site. — The stripping of the quarry site will consist of clearing quarry area and waste disposal area, stripping overburden and unsuitable rock in quarry area, and disposal of waste material. The estimated quantity of 100 acres clearing, 500,000 cubic yards overburden, and 665,000 cubic yards of unsuitable rock are based on opening the quarry between elevation 1050 and 1170 to about a 400-foot depth and following along the 1050 contour as indicated on the attached map. The waste material (overburden and rock) will be placed along the 1050 contour adjacent to the quarry. Waste material placed in this area will be paid for at the rate of $0.30 per cubic yard, with the estimated cost in excess of $0.30 per cubic yard charged to the work.
*****
summary cost — waste material
1,165,000 Cu. Yds.
1. Clearing Area_$15, 021.91
2. Overburden, load and haul_ 99,284.07
3. Rock Waste, drill and blast- 258,773.06
4. Rock Waste, load and haul_178, 919.82
Total Direct Cost_ 551,998.86
Unit Cost — $0.4738 per cu. yd.
Payment to contractor for stripped and scalped material.
Estimated Quantity 1,165,000 c.y. @ 30^- 349, 500.00
Total Direct Cost to Contractor- 202,498.86
Additional cost above 30<¿ per ton will be distributed to pay items on a tonnage basis as follows:
Item No. 1 Coarse Aggregate, 71%- 143,774.19
Item No. 2 Pine Aggregate, 29%-- 58,724.67
Total_ 202,498.86
*394 30. The foregoing estimate was based on a sidehill as contrasted to a crest operation, the former being considered by-defendant as more economical on account of less overburden. The estimate was made upon the further consideration that there was a good possibility of clay in the area. The witness who prepared the estimate testified that it was computed in terms of solid volume and that if a swell factor was included-it would, added to the 1,165,000, total 1,506,000 cubic yards in the wastepile. In addition, the estimator figured that 117,760 cubic yards would be wasted in the crushing operations and that defendant would not pay for this but it would increase the wastepile yardage to 1,623,000 cubic yards. One Government geologist told the estimator there might be as much as 1,800,000 cubic yards of stripping and waste. None of the yardage in excess of. 1,165,000 is reflected by defendant’s estimate in evidence. The contract, as previously noted, provided that payment for stripping and waste would be on the basis of the bulk quantity measured in the waste area. It is found that the weight of credible evidence is that defendant’s estimate of 1,165,000 cubic yards was so computed. Defendant’s estimate was unknown to plaintiff prior to submission of bids.
31. As of September 26,1947, the co-venturers, operating as the Ozark Dam Constructors, were well along in building the Bull Shoals Dam and were reaching the point where concrete aggregate would soon be needed. Accordingly, they were anxious to obtain an early award of the quarry contract. On September 26,1947, Boss White, representing plaintiff, met with representatives of the Government to discuss the problem. There was disagreement on the costs and no understanding was arrived at as to an award.
32. Subsequent conferences were held. In an attempt to convince defendant’s representatives, White made an analysis and justification of plaintiff’s bid on the basis of known costs encountered in operation of the Norris Dam quarry in the Tennessee Valley. Plaintiff’s unit costs for estimated stripping exceeded those of defendant. Plaintiff represented that its total costs were estimated to be $8,314,000'with a mark-up of 11.86 percent for contingency and profit, for a total bid of $9,301,000.
*395 33. Further negotiations were conducted by plaintiff with the division engineer at Dallas, Texas, and on October 27, 1947, plaintiff, fearing that further delay might adversely affect the progress on the dam and that defendant would readvertise the work, submitted some alternate proposals. One of these was adopted as article 29 to the contract. In summary, it provided that payment under the contract would be made at the unit prices bid by plaintiff but if it was found that the bid prices were higher than plaintiff’s actual costs, including an agreed-upon overhead plus 10 percent, the difference between that amount and the amount paid at the bid prices would be divided equally between plaintiff and defendant. The contract was entered into on November 3, 1947. Notice to proceed was issued by defendant on January 12, 1948, and received by plaintiff on January 14, 1948. Operations commenced immediately there-1 after with stripping commencing on March 8, 1948.
34. As a result of the profit-sharing provisions of article 29 of the contract, defendant assigned its engineer, Wooden, to maintain a continuous review of all costs entered in plaintiff’s books and records. Wooden received' the fullest cooperation of plaintiff’s staff and.throughout the performance of the contract maintained his office in the offices of the joint venture where he was given complete access to all of plaintiff’s books and records.
35. As previously indicated defendant contemplated a sidehill operation but did not require it. Plaintiff decided on the location for a sidehill operation with defendant’s approval. Plaintiff began the sidehill development of the quarry in the area between sections EE and FF on or about March 8, 1948, as noted in finding 33. This, too, was with defendant’s knowledge and approval pursuant to GC-3 of the specifications.
36. In performing the work plaintiff first had to clear the quarry site of trees and overburden material reposing above the acceptable limestone or A-zone rock from which the aggregates were to be manufactured. This stripped material was then deposited in approved waste areas on the side of the mountain adjacent to and below the quarry floor. A-zone material was then drilled, blasted,, loaded and *396 trucked to the primary crushing plant which consisted of two gyratory crushers equipped with scalping screens for the purpose of removing objectionable material from the crushed product. After the rock had been processed through the primary crushing plant the acceptable material was deposited in a stockpile from which it was subsequently transferred by means of a conveyor belt to the damsite about 7 miles away. At the damsite the rock was then processed through the classification plant where it was passed over screens of various sizes and deposited in stockpiles of graded or classified aggregate. The part to be used as coarse aggregate was then conveyed to the concrete mixer plant and the portion to be converted into fine aggregate was sent to the sand production plant where it was ground into sand.
37. From the start of the sidehill operation, once overburden was stripped away, plaintiff encountered numerous clay-filled cavities and seams. In the course of blasting the rock, this clay was unavoidably scattered and as a result a large portion of otherwise suitable rock became contaminated. Plaintiff complained verbally to defendant about the character and condition of the materials encountered and that the waste, as a result of clay contamination, was in excess of what reasonably could have been anticipated. By August 3, 1948, approximately 192,176 cubic yards were placed in the waste areas.
38. In the meantime, on April 27, 1948, the district engineer issued a change order known as modification No. 2 with revised drawings. The modification permitted plaintiff to obtain aggregate material from the rock formation immediately overlying the original zone of acceptable material.Defendant considered that this would provide substantial savings to the Government. Plaintiff received this modification on July 29,1948.
• 39. In July 1948 plaintiff gave consideration to whether it might not be better to develop the quarry into the crest of the mountain to assure the necessary quantity of aggregate without so much waste. At this time plaintiff had developed what its man, Slocum, called “a pretty good quarry face” on the sidehill showing what the quarry there would be like. It was plaintiff’s judgment that, although the *397 crest had heavier cover, there might be less deterioration of the limestone beneath, fewer cavities, less waste due to clay and a higher quarry face. This proved to be the fact. In July 1948 plaintiff had stripped 150,000 cubic yards of overburden and unsuitable rock by the sidehill operation at a cost of approximately $200,000. This cost was at a rate of about $1.33 per cubic yard, or at a loss of $1.03 per cubic yard to plaintiff. Ross White had anticipated plaintiff would lose 40 cents per cubic yard on stripping as shown in finding 27(f).
40. In considering this possibility of extending the quarry into the crest of Lee Mountain, plaintiff examined the boring logs in the contract drawings for the seven holes nearest to the crest. This information showed that the area contained cavities and sandy seams but did not indicate presence of clay. Clay, of course, had been encountered elsewhere by plaintiff’s using similar information which did not indicate it. However, the documents on their face indicated favorable quarrying conditions in plaintiff’s judgment and demonstrated that A-zone rock varied in depth from 25 feet at hole No. 14 to 80 feet at hole No. 1. Plaintiff concluded that a satisfactory quarry face could be developed with a minimum of waste.
41. Pursuant to paragraph GC-3 of the specifications, plaintiff consulted with defendant’s representatives about moving the operation to the crest of the mountain. Plaintiff’s man, Slocum, advised defendant that, based on actual stripping costs already incurred, it would cost $925,000 to expose the required quantity of A-zone rock if the sidehill operation was continued and that in his opinion the total quantity of rock required under the contract could be obtained from the crest area of the mountain with a total stripping cost of $720,000. Defendant was also fearful that a sufficient quantity of acceptable rock could not be produced from the sidehill operation. Defendant did not direct but did agree on July 20, 1948, to plaintiff’s proposal to change from a sidehill operation to an excavation at the crest of the mountain. After commencement of operations in the crest plaintiff did not resume stripping on the side of the hill, except briefly in 1950 when so directed by de *398 fendant. Defendant also directed that stripping be stopped when excessive soft and disintegrated rock was encountered.
42. There were only seven borings near the crest, Nos. 1, 4, 5, 10, 14, 21, and 22. They were inadequate for plaintiff’s purposes. None of them were across the crest itself.
Plaintiff drilled some 38 holes across the top of the mountain to determine the quantity and type of materials which would have to be stripped to expose the acceptable rock. Plaintiff was prepared to handle the stripping of rock but did not have enough equipment to handle a large volume of common excavation. It desired to award a subcontract for the latter. These explorations revealed that there were between 700,000 and 800,000 cubic yards of common excavation overlying the rock which could most efficiently be removed with scraper-type equipment and that there were in addition approximately 600,000 cubic yards of rock. Plaintiff asked for competitive bids for removal of 665,000 cubic yards of common excavation. Under date of September 2, 1948, plaintiff entered into a subcontract with M. E. Gillioz of Monett, Missouri, whereby Gillioz removed 706,610 cubic yards of overburden from the crest area and was paid by plaintiff 26 cents per cubic yard therefor.
Plaintiff subtracted from the amount due the subcontractor the sum of $1,250 for omission of a. performance bond and paid Gülioz a total of $182,468.60. ■
43. The stripping in the crest area was carried ahead of the drilling and blasting of rock so as to preclude any contamination of usable rock by the overburden material, Plaintiff established a reasonably economical quarry face. However, plaintiff encountered cavities of various sizes in the area from which stone was to be taken for aggregates and these cavities contained clay. Plaintiff attempted to reduce the amount of clay contamination by regulating the blasting and by excavating the clay from the cavities where possible. Efforts were also made to separate the clay-contaminated rock from good rock. However, the existence of the clay in cavities and seams caused large amounts of otherwise suitable rock to be wasted.
44. As previously found, paragraph SC-12 (c) of the specifications provided in part: .
*399 Primary crushing and scalping shall be done at the quarry. The product of the primary crusher shall be screened to remove objectionable shaly material and thin, flat, elongated particles not suitable for further processing.
The foregoing quotation relates to materials which could be expected in any quarry operation but makes no reference to clay. The scalping process would remove from the stream of acceptable rock all particles, both rock and clay, smaller than the scalping screen’s size. In spite of efforts to deliver to the primary crusher only rock and no clay, some clay-contaminated rock was presented to the crusher. On various occasions defendant complained of the presence of clay lumps in the finished aggregate and plaintiff agreed to install larger mesh screens on the scalping equipment to help eliminate this. Plaintiff’s representative, Eoss White, testified that he estimated 100,000 cubic yards of material would have to be wasted in the scalping process. Defendant’s estimator concluded that 117,760 cubic yards would normally be wasted in this manner. However, the quantity of material plaintiff actually wasted in the scalping process and for which, plaintiff was paid $136,340.40, which was computed at the rate of 30 cents per cubic yard, was 454,468 cubic yards. The exact amount of this excess attributable to clay cannot be established, but the weight of the evidence suggests that it was not only substantial but probably all due to clay.
45. The total amount of stripping and waste encountered by plaintiff and paid for by defendant was 2,763,067 cubic yards. This was, as heretofore seen, far in excess of what either party estimated. Plaintiff could not, upon its examination of the core borings and contract drawings, have reasonably foreseen so much waste. The last direct costs incurred by plaintiff for stripping and waste were recorded on plaintiff’s books on January 31, 1951, and quarrying of rock for aggregate production ceased on or about April 10, 1951.
46. On April 14, 1950, plaintiff addressed its first written complaint or claim to the district engineer at Little Eock as follows:
*400 We have repeatedly called to your attention verbally the conditions of the Quarry from which we are obtaining aggregate for Bull Shoals Dam and have discussed with you what steps might possibly be taken to alleviate the current condition and eliminate possible delays and excessive costs in the future. As you know we have continued to operate your Quarry at excessive costs to us and under great difficulties which would never have been countenanced by any other Quarry Operator in order to assure you and Ozark Dam Constructors the aggregate which must be furnished for the construction of the Bull Shoals Dam.
We herewith confirm our previous verbal protests that the Quarry is not as represented by the Plans and Specifications. Not only has your estimated quantity of 600,000 cubic yards of waste been greatly exceeded but the number and extent of cavities is entirely out of line with either your or our expectations.
It is apparent that to continue to work the present face will only serve to increase the damage to the Government and ourselves. Furthermore it is questionable whether there is sufficient suitable material in the approved Quarry site and within the approved depth zones to complete the Dam, if we continue on the present face, due to the unexpected excessive proportion of clay pockets and other unsuitable materials.
We therefore herewith request:
a. Beimbursement of all additional costs incurred heretofore or in the future caused by or growing out of the above conditions, which are not as represented.
b. Your immediate instructions as to what should be done as regards future operation of your Quarry.
Will you please give immediate consideration to this request as this matter is extremely pressing and serious and great damages will be incurred by both Flippin Materials Company and Ozark Dam Constructors if we fail to receive specific instructions from you immediately, that will result in a practical solution.
47. On May 18, 1950, the acting district engineer replied as follows:
Deference is made to your letter of April 14, 1950, relative to the conditions of the quarry from which you are obtaining aggregate for Bull Shoals Dam, and in which you allege that the auarry is not as represented by the plans and specifications.
From studies of the specifications, field investigations of the quarry site, and studies of the job requirements, *401 it is the opinion of this office that the quarry is as represented by the plans and specifications. These studies indicate that there is sufficient suitable material available within the approved depth zones to meet the aggregate demand for the work. However, samples of materials below the approved depth have been obtained and are now being tested by the Southwestern Division Laboratory with results of tests expected to be available prior to June 1, 1950. Immediately upon completion of the tests you will be advised of the suitability of material in the extended depth zones.
In view of the above facts, your request for additional compensation is denied.
In the event that the foregoing decision is not satisfactory, you are hereby advised of your right to appeal within 30 days in accordance with the provisions of Article 11 of the contract. If you desire to submit an appeal, it should be prepared in accordance with the “Rules of the Corps of Engineers Claims and Appeals Board,” a copy of which has previously been furnished to you, and should be addressed to the Chief of Engineers, Department of the Army, Washington, D.C. The appeal should be directed to the District Engineer, Little Rock District, Corps of Engineers, Little Rock, Arkansas, in original and five copies for transmittal to higher authority.
48. On June 7,1950, plaintiff appealed the decision of May 18, 1950, to the Chief of Engineers. The appeal requested “reimbursement of the difference between what it has cost the contractor to perform the work and what it would have cost the contractor if the unforeseen conditions had not been encountered and the quarry had been as represented by the contract drawings.” No amount was stated. A hearing was held by the Corps of Engineers Claims and Appeals Board on June 27, 28, and 29, 1951. At this hearing plaintiff contended that it had been stated by a Government employee in a conference with Colonel Feringa that the Government’s estimate of stripping and waste was 487,000 cubic yards and plaintiff had an overrun of 500 percent, since it anticipated only 500,000 cubic yards. It is noted that the first pay estimate, February 18, 1948, contained an estimate of 487,000 cubic yards. The board did not have before it the estimates of the members of the co-venture as set forth in finding 27. It was pointed out by plaintiff’s counsel, however, that the *402 Flippin Materials Company as such never actually prepared an estimate, that the various members of the co-venture made individual estimates. Prior to submission of bids, plaintiff did not rely on the 487,000 figure although such a figure was considered by plaintiff during subsequent negotiations. The weight of the evidence is that defendant’s true estimate was 1,165,000 cubic yards, as shown in finding 30. There was no estimate of quantity contained in the invitation, contract or specifications.
49. On June 11, 1951, the acting district engineer made formal findings of fact with respect to plaintiff’s claim. A copy was sent to plaintiff and reference was made in the letter of transmittal to the decision of the contracting officer on May 18, 1950. Each of plaintiff’s allegations was considered in detail and the following findings were made:
a. No estimate of the quantity of waste was made to any bidder prior to the opening of bids.
b. The number and extent of cavities and the amount of overburden discovered by the Government were accurately shown on the drawings.
c. Sufficient material was available at the quarry site within the approved depth zones as specified in the original contract prior to issuance of Modification No. 2.
d'. Bidders were allowed 25 days to prepare bids and negotiations were conducted with the contractor over a period of an additional 41 days.
e. Modification No. 2 was issued for the sole purpose of utilizing rock that would otherwise be wasted and in the interest of economy.
f. Actual amount of waste has not as yet been determined.
50. The Claims and Appeals Board dismissed plaintiff’s appeal on January 2, 1952. The board stated in pertinent part:
# $ * $ 1 $ $ *
Prior to the issuance of an invitation to bid for. the furnishing of the aggregate, prospective bidders, including appellant, attended a conference on 26 August 1947 with Government representatives for the purpose of discussing the provisions of the forthcoming invitation. Because in the procurement of the aggregate it was necessary, in effect, to open a quarry, concern was expressed by these prospective bidders as to the un *403 certainty of the amount of material which would haye to he stripped or wasted in the quarrying operations, in order to secure the necessary quantity of aggregate, and it was suggested that the amount thereof be indicated and a price provided for waste material, rather than have the cost of the stripping and wasting included in the unit prices for aggregate as was proposed by the Government in the invitation. Because of the representations of the prospective bidders the proposed invitation was amended prior to issuance to include a provision in the specifications for the payment of 300 per cubic yard for all overburden and waste material,[15] but no estimate of quantity was contained in the invitation or attached specifications. This 300 per cubic yard was less than the actual cost of stripping or wasting estimated by the Government (470), but was intentionally put in the specifications for the purpose of making stripping an unprofitable item, thereby limiting the amount of stripping which would be done. Appellant recognized the inadequacy of the 300 price and included $200,000.00 in its computation of unit prices to cover this item. In the invitation the Government offered cross sections of cores taken by the Government within the proposed quarry area, 21 being attached to the original invitation dated 29 August 1947 and 12 additional furnished by Addendum No. 1 dated 5 September 1947. Material considered suitable for the production of aggregate was designated on the drawings as Zone “A” material and the drawings in the legend showed a symbol for “cavity” without any differentiation as to whether the “cavity” was a void, partially or wholly clay filled. Bidders were advised that the actual cores recovered were available for inspection, and representatives of appellant did actually examine the cores before bidding, although the extent or nature of such examination is not known. On 23 September 1947, upon opening of bids, Flippin Materials Company was low bidder, offering fine aggregate at $2.54 per ton and coarse at $2.41 per ton. The bid included the provisions for payment at 300 per cubic yard for waste material. The amounts bid, however, being in excess of those authorized by statute, based on Government estimate, a conference was held on 26 September 1947 between Flippin Materials Company and Government representatives to consider possible reduction or adjustment in the prices bid, or rejection of all bids. Subsequently, it was agreed that payment for the aggregate furnished by Flippin *404 Materials Company during the life of the contract would be made at the bid prices, but if upon completion it was found that the bid prices were higher than the contractor’s actual costs (including an agreed upon overhead) plus 10 per cent, the difference between that amount and the amount paid at the bid prices would be divided equally between the contractor and the Government.[16] Such provision was incorporated in the contract prior to execution.
Notice to proceed was issued 18 January 1948 and the contractor began clearing operations, 17 February 1948, and stripping, 18 March 1948. The core borings taken by the Government ran, in the main, along the north and east perimeter of the crest of Lee Mountain and indicated a possible side hill quarrying operation. Several borings, however, had been taken on the opposite sides of the crest. The contractor first opened a road at elevation 1050, the floor of the quarry, and a cut 600 to 800 feet long, and prepared to enter the quarry at a Eoint approximately in the center of the line covered y the borings. The contractor also placed its primary crushing equipment at that approximate central point as it would permit the greatest flexibility of operations laterally and was indicated to be an area containing suitable material. Shortly after quarrying operations had begun the contractor encountered numerous clay pockets and seams, which affected its planned operations and the economical and practical utilization of good material, considering the nature of the contractor’s equipment, the magnitude of its operations, and the contamination of good rock by clay upon blasting. Upon the discovery of this condition, consideration was given as to whether operations should be expanded laterally or whether it was more advisable to quarry directly into the crest of the mountain. It was realized that, while a greater amount of overburden would be encountered upon entering the crest, this overburden would possibly offer better protection against weathering of the Zone “A” material and that fewer and smaller deposits of clay would be present. The core borings at the opposite side of the crest indicated a strata of limestone running through the crest. For these reasons, in July 1948 it was decided that quarrying would be continued into the crest of the mountain. This determination was with the knowledge and consent of the Government, but not at its express direction.
*405 After entering this area, however, the contractor also encountered clay pockets and seams, which affected its operations in the same manner as had occurred in the side hill operations. By letter, 14 April 1950, addressed to the contracting officer, the contractor requested reimbursement for costs incurred due to the fact that the quarry was not as represented by the plans and specifications, and that not only had the Government estimated quantity of 600,000 cubic yards of waste been greatly exceeded, but that the number and extent of cavities was entirely out of line with either the Government’s or the contractor’s expectations. The claim was denied by the contracting officer by letter, 18 May 1950, and on 7 June 1950 instant appeal was taken.
Examination by this Board discloses that the core logs shown on the contract drawings, within the limitations imposed by the scale of the drawings, accurately reflect the conditions encountered during the recovery of the cores at the points taken. Where cavities were encountered they were shown on the core logs by a symbol for “cavity” and no distinction was made as to whether the cavities were void, partially or wholly filled with clay deposits. The following core boxes were inspected and upon such inspection the Government and appellant agreed by stipulation that such cores contained clay, as follows:

Core sections were not available on holes 1,17 and 26, but the following additional boxes of core sections were inspected, 27 June 1951, in which no clay sections were found:
$ H* H: H* $
Cores Nos. 15, 18 and 24 were outside the area in which the contractor operated, and the clay found in Core No. 10 was in the overburden and not in Zone “A” material to be used for the production of aggregate.
*406 The contract was entered into on WD Form No. 1 (SWD-16 July 1945), which is basically a supply contract, and did not contain certain articles usually found in Government construction contracts, among which is the provision generally designated as “Changed Conditions.”
DECISION
This Board is of limited jurisdiction, having only such appellate authority as has been conferred on it by the contracting parties. Any adjustment by this Board, therefore, must be authorized under the express terms of the contract as applied to established circumstances. If it be considered that there were misrepresentations made by the Government which amounted to a breach of warranty, then the claim is one for damages, authority to adjudicate which is not in this Board. Appellant submits that adjustment may be authorized under Article 2 of the contract.[17] As will be seen therefrom, that article relates to intended and contemplated changes in the items to be furnished under the contract made at the express written direction of the contracting officer, and resulting in a deviation from specific requirements set forth in the contract. In the instance at hand, no change has been made in the product to be furnished, either in character, quality or quantity. As to deviation from specific requirements of the contract, the logs of the cross sections of the cores taken by the Government accurately reflected the conditions encountered at the point taken (limited by the scale of the drawings and to the extent customarily shown), and both the drawings and the cores were made available to appellant for examination prior to bidding. The cores, if considered alone, do not disclose the condition actually encountered *407 by appellant. However, the presence of clay deposits of undetermined size or quantity in limestone beds is not unusual and may reasonably be expected to appear in pockets, and seams uncertain as to number or size. Core borings would only disclose the condition of subsurface materials at the exact point of recovery and would not warrant an unqualified assumption that clay deposits might or might not appear at a point a short distance away. The Government, although requested to include an estimated quantity of waste in the contract did not do so, thereby indicating a refusal to make a prognosis of the amount of unsuitable material which could be expected or to assume responsibility for estimating the quantity for bid purposes. Further, the contract did not provide for assumption of responsibility for “Changed Conditions” customarily assumed under standard Government construction contracts. In view thereof, responsibility for determining the estimated quantity of waste material was left to the prospective bidders.
For the above-stated reasons, it is the opinion of this Board, and it so finds, that there is no contract provision which would permit adjustment of the contract price under the circumstances. The appeal, therefore, must be denied.
51. It is noted from the foregoing that the board did not consider paragraph GC-2 or SC-12 in any detail or apparently have knowledge of the advance information bulletin, the work of Morrison-Knudsen in the Everton formation at the Norfork Dam, the significance of clay losses in drilling or know that the Bull Shoals and Norfork drawings showed cavities containing clay whereas similar diagrams or legends on the drawings in the instant case did not show clay in cavities. The board did not give consideration to the fact that the field logs had not been examined by plaintiff nor did it consider or determine whether they were available to plaintiff in fact or law, what the effect of their examination by plaintiff would have been, or whether defendant concealed any material facts which misled plaintiff. As previously noted, the field logs were first seen by plaintiff at the board hearing. While these field logs clearly showed clay which was not evident in the boring logs on the drawings nor fully evident in the physical cores, it is found that the evidence does not support any finding that the conditions *408 encountered in the crest, as distinguished from those on the side of the hill, could have been predicted or expected, except in general terms, if the field logs had been examined by plaintiff, for there were no borings made by defendant except around three sides of the crest and none in the crest itself. Neither party had contemplated a crest operation. It was made necessary, however, by the type and extent of clay encountered in the sidehill operation where the field logs or the data in them, if accurately transcribed in the boring logs on the drawings, might have alerted plaintiff to the true conditions there. Having found unexpected and unfavorable conditions in the sidehill operation it would have been reasonable to assume that they might exist elsewhere on the same mountain even though no borings were available to demonstrate it one way or the other. To the extent that plaintiff’s claim was based on a misrepresentation of facts by defendant, although not presented as fully to the board as to the court, it was one over which the board had no jurisdiction.
52. Plaintiff’s claim herein for $602,845.50 is based on its contention that because of the clay encountered in its side-hill operation it was forced to move to the mountain crest. Plaintiff therefore claims the additional expense involved in the excessive waste at the quarry and at the primary crusher and for removal of the additional overburden at the mountain crest, which was not considered in its bid. Plaintiff alleges this was defendant’s responsibility caused by defendant’s failure to include information regarding the clay-filled cavities in the rock formations in log drawings of the core borings furnished plaintiff.
,5.3. It is reasonable to conclude that 1,165,000 cubic yards of stripped and scalped material would have been wasted in a normal sidehill operation for which plaintiff was to be paid 30 cents per cubic yard. The parties have agreed that this 30 cents per cubic yard was not intended to cover the actual cost involved in processing this waste material. It was inserted in the contract at the price of 30 cents per cubic yard by defendant in order to keep the waste material at a minimum. Plaintiff’s unit bid prices on aggregates were increased to make up for this anticipated loss on wasted material.
*409 54. The actual total of wasted and scalped material, for which plaintiff was paid 30 cents per cubic yard, amounted to 2,763,067 cubic yards. This included 1,601,989 cubic yards of overburden wasted at the quarry site by plaintiff’s operations, 706,610 cubic yards of overburden subcontracted to M. E. Gillioz, and 454,468 cubic yards of material wasted after processing through the quarry and primary crusher.
55. Since the court holds that the plaintiff is not entitled to recover, it is unnecessary for the court to determine the amount of damages suffered by the plaintiff.
56. Article 29 of the instant contract reads as follows:
Article 29. Reduction in Price.
a. The term “Contractor’s adjusted cost” shall be the contractor’s actual cost of performance as determined in accordance with subparagraph d below, plus 10 percent.
b. The term “computed contract price” shall be the total contract price computed at the unit prices provided in Schedule “A” and in paragraph CS-12d of the specifications using the actual quantities of work performed.
c. In the event that the contractor’s adjusted cost is less than the computed contract price, the contract price shall be reduced by a lump sum equal to one-half the difference between the contractor’s adjusted cost and the computed contract price.
d. It is understood and agreed between the parties hereto that the actual cost of performance shall include all expenditures actually made or cost incurred in the performance of the contract and shall be computed in accordance with recognized commercial accounting principles. The following costs shall be included. It is understood and agreed that the following list is not a complete outline of costs to be included and that the applicability of items not listed shall be determined in accordance with the principles set forth above.
(1) (a) The total cost of the aggregate processing plant including the erection thereof; and (b) the total cost of all equipment used exclusively in the performance of this contract. In the event that any plant or equipment is purchased or transferred from any of the co-partners or joint-venturers who are parties to this contract or from the Ozark Dam Constructors, the sum to be entered as cost therefor shall be as mutually agreed between the contractor and the contracting oflicer.
(2) Home office expense at the rate of two percent *410 (2%) of the total costs of performing the work under the contract.
(3) Thirty percent (30%) of the field office overhead and supervision expenses which are properly chargeable to work being accomplished both by the contractor and Ozark Dam Constructors shall be charged to the costs of performing the work under this contract. The percentage _ to be charged for field office overhead and supervision expenses shall apply only to expenditures made and costs incurred subsequent to date of this contract. In the event that the services of the field office and supervisory force are used on contracts other than this contract and Contract No. W-03-050-eng-461 for the construction of Bull Shoals Dam and appurtenant works, an equitable adjustment of the percentage of cost to be charged hereunder shall be negotiated between the contractor and the contracting officer.
(4) Total costs of performing the work under the contract shall be credited with the sales price of all scrap, aggregates, or byproducts sold by the contractor.
(5) Upon completion of the contract or when no need of the plant, equipment, tools, materials, or supplies is required for the performance of the contract, all salvageable items shall be sold at the best price obtainable and the net proceeds credited to the total costs of perf ormming the work under the contract. The contractor shall have the option of retaining any of the plant, equipment, tools, materials, and supplies by crediting to the cost of the work an amount agreed on by the contractor and the contracting officer as representing the fair value thereof. Subject to the contractor’s prior option and if the contracting officer shall so direct, the contractor shall transfer title to any of the plant, equipment, tools, materials, and supplies to the Government at an amount agreed on by the contractor and the contracting officer as representing the fair value thereof. In either event, if the parties fail to agree to a price the items shall be sold.
(6) Rental of Equipment. — Where equipment is rented from third parties, such rentals shall be included in contract costs. Where equipment is rented from Ozark Dam Constructors by the contractor, or from the contractor by Ozark Dam Constructors, rental rates shall be the hourly or monthly depreciation rates set up on the books of the respective companies for the particular piece of equip *411 ment. Such hourly or monthly rates shall depreciate the equipment over its estimated period of use. The company using the equipment shall bear all operating and running repair cost while in its service. The cost of major repairs and overhauls shall be allocated between the two companies in proportion to the number of hours or months each uses the particular equipment.
e. All original timecards or payrolls, material records, and accounts for all charges and expenditures shall be preserved and made available at all reasonable times for audit by the Government. Separate records shall be maintained by the contractor of all items and accounts which will constitute the basis of a determination of actual cost of performance.
f. At the end of each three months’ period, the contractor shall furnish the contracting officer with a statement prepared in accordance with recognized commercial accounting principles showing the contractor’s cost per unit of payment items under the contract (including items for stripping and waste), provided, however, that no statements shall be required nor deductions made prior to January 1, 1950. The amount of reduction in price shall be computed from this statement and an appropriate deduction made from payments due the contractor. These statements shall be considered only in determining the periodic deductions to be made. The final amount to be deducted shall be determined as provided in subparagraph c above and shall be based on determination of the costs made by an independent Certified Public Accountant selected by the contractor and approved by the contracting officer. The cost of such audit shall be included in cost of performing the work under the contract.
g. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 11 hereof.
57. Plaintiff’s total adjusted contract price under this contract amounted to $10,386,935.86. Plaintiff’s “adjusted cost,” which included all applicable contract expenses plus 2 percent for home office overhead and 10 percent profit, amounted to $8,697,306.85. Therefore, plaintiff’s additional net income amounted to $1,689,629.01 which defendant reduced by one-half in accordance with paragraph (c) of article 29 and paid plaintiff 50 percent thereof, which totaled $844,814.50.
*412 58. It is plaintiff’s contention that in view of defendant’s misrepresentation of the subsurface conditions, it is questionable whether any recovery is applicable under article 29. Plaintiff submits that whatever conclusion is reached as to the validity of article 29, it has no application to the present status of this controversy. Plaintiff maintains, however, that should the court recognize the provisions of article 29 as binding, they would not apply until such time as plaintiff recovered the damages in full and deducted the costs of litigation and other expenses attributable to the production of these moneys.
Defendant contends that article 29 is binding under this contract and that any recovery by plaintiff is subject to an immediate 50 percent reduction in accordance with the provisions of this article. Defendant maintains, further, that this 50 percent reduction should be made prior to any reduction for litigation and other costs of recovery and that to include such costs prior to the 50 percent reduction would be contrary to the provisions of this article.
DEFENDANT’S COUNTERCLAIM
59. On September 5, 1958, defendant filed a counterclaim against plaintiff in which it seeks to recover $83,478.17, subject to adjustment under article 29 of the contract, representing the amount paid to plaintiff by defendant under change order No. 7 to the contract. This change order was issued by defendant to compensate plaintiff for the costs incurred during a period of delay imposed upon the performance of the work. The parties have agreed that the fact that plaintiff’s operations were so delayed is not in issue. There is no question as to the amount paid under change order No. 7. Defendant’s counterclaim is directed solely to the legal propriety of any payment to plaintiff for the increased costs that resulted from this delay.
It was the understanding of the parties that the pertinent evidence and testimony produced in the case of Ozark Dam Constructors v. United States, 153 Ct. Cl. 120 (1961), would apply to defendant’s counterclaim.
60. Under date of May 8,1947, the defendant entered into contract No. W-03-050-eng-461 with Ozark Dam Con *413 structors to construct the Bull Shoals Dam, a concrete, gravity-type dam, and appurtenant works for an estimated $22,146,440. The contract provided that Ozark Dam Constructors would furnish the materials except as provided by the contract. Paragraph SC-11 of the specifications to contract W-08-050-eng-461, as amended by modification No. 2, dated May 17, 1948, provided that the Government would furnish all the cement f.o.b. Cotter, Arkansas, and all the aggregate required for concrete used in the permanent construction work. The specifications further provided that the Government would not be liable for any expense or delay caused the contractor by delayed deliveries of cement or aggregate except as provided under article 9 of the contract.
The general conditions of the specifications provided that the contracting officer might order the contractor to suspend all or any part of the work for such period of time as might be determined by him to be necessary or desirable for the convenience of the Government, and that the contracting officer should make an equitable adjustment in the contract price and modify the contract where such suspension unreasonably delayed the progress of the work and caused additional expense or loss to the contractor.
Article 9 of contract W-03-050-eng-461 with Ozark Dam Constructors provided that the right of the contractor to proceed should not be terminated or the contractor charged with liquidated or actual damages because of any delays in the completion of the work due to causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of the Government, acts of another contractor in the performance of a contract with the Government, and strikes. Article 9 further provided that the contracting officer should ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justified such an extension, and that his findings of fact thereon should be final and conclusive on the parties, subject only to appeal within 30 days to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of *414 time for completing the work should be final and conclusive on the parties.
Article 15 of contract eng-461 provided that,, except as otherwise specifically provided in the contract, all disputes concerning questions of fact arising under the contract should be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision should be final and conclusive on the parties.
61. Cement deliveries were delayed on the dam contract, No. W-03-050-eng-461. There was a strike against the. Missouri Pacific Railroad. The Government did not deliver the cement by alternate means. By letter of September 16, 1949, the contractor requested that the work be suspended under paragraph GC-12 of the specifications until cement could be furnished. The contracting officer denied the request and called attention to paragraph SC-11 (c)(1) of the specifications, which stated in part:
The Government will not be liable for any expense or delay caused the contractor by delayed deliveries except as provided under Article 9 of the contract.
62. The Corps of Engineers Claims and Appeals Board considered the appeal of Ozark Dam Constructors under article 15 of the contract and affirmed'that under the contract and the specifications the Government was only obligated to grant a contract time extension to Ozark Dam Constructors, Inc., for delays in furnishing cement.
' 63. Contract No. W-03-050-eng-525, with the Flippin Materials Company, provided that Flippin would furnish all plant, labor, equipment, and material and perform all work necessary to produce material for approximately 3,800,000 tons of concrete aggregates for the Bull Shoals Reservoir project in the White River Watershed, White River, Marion and Baxter Counties, Arkansas. The material was to be quarried from the Government-owned site in the vicinity of Flippin, Arkansas. The contractor was to deliver, process, and place the finished material in designated storage piles on the right abutment of the Bull Shoals Dam' site, all in accordance with the contract specifications.
64. Paragraph SC-1 of the special conditions of the speci *415 fications provided that the contractor produce aggregate ready for use not later than May 1, 1948, and deliver such aggregate in the quantities and sizes when and as required by the Government, on notices issued to the contractor by the Ozark Dam Constructors.
The specifications estimated that deliveries of aggregate would extend from May 1, 1948, over a period of approximately 2y2 years and stated that “due to the uncertainties as to the progress of the work on which it will be used, a definite schedule of aggregate requirements cannot be guaranteed.”
Paragraph GC-8 of the general conditions of the specifications provided as follows:
GC-8 SUSPENSION oe work. The contracting officer may order the contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the contractor, the contracting officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed the contractor provided, however, that the suspension was not due to the fault or negligence of the contractor.
65. Contract W-03-050-eng-525 provided in article 5 that the contractor should not be charged with actual or liquidated damages or any excess cost when delay in delivery was due to causes beyond the control and without the fault or negligence of the contractor, including but not restricted to acts of the Government and strikes. Article 5 further provided that the contracting officer ascertain the facts and extent of the delay and extend the time for making delivery when in his judgment the findings of fact justified such an extension, and that his findings of fact thereon would be final and conclusive on the parties, subject only to appeal within 30 days, by the contractor to the head of the depart *416 ment concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for making delivery would be final and conclusive on the parties.
Article 11 of the contract on disputes provided that, except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under the contract should be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative whose decision would be final and conclusive upon the parties.
Article 29 of the contract provided for a reduction in price, as heretofore set forth in finding 56. All costs of plaintiff’s operations, including any due to the strike, were charged to the contract, before application of article 29.
66. As stated in finding 61, cement deliveries by the Government were delayed. On December 30,1949, plaintiff requested that a suspension order be issued under the contract and the contract price adjusted, alleging that during the strike it had suspended its work of supplying aggregates. The contracting officer denied the request. On appeal under article 11 the Chief of Engineers adopted an opinion of the Corps of Engineers Claims and Appeals Board, in Appeal No. 203. The board had held that an “appropriate adjustment should be made to compensate appellant for the additional expenses occasioned covering the period of time it was required to shut down the processing of aggregates brought on by the strike of the Missouri Pacific Eailroad.”
67. Pursuant to instructions the contracting officer, under date of October 30, 1956, issued a change order, modification No. 7, to contract W-03-050-eng-525, which provided:
The lump-sum amount of $83,478.17 will be added to the computed contract price, as defined by Article 29, before the application of said Article 29, as complete compensation for the delay resulting from the strike of the Missouri Pacific Railroad.
All other terms and conditions of said contract as it heretofore may have been modified shall be and remain the same.
Pursuant to the foregoing, plaintiff received $41,739.08 after application of the provisions of article 29.
*417 CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is dismissed. The court further concludes as a matter of law that defendant is entitled to recover on its counterclaim and judgment is entered for defendant in the amount of $41,739.08 against the Flippin Materials Company and its several members.

 Plaintiff’s exceptions to the findings total 87 printed pages, and it answers. the defendant’s exceptions in an additional 152 printed pages; the plaintiff’s-briefs total 137 further printed pages. Defendant’s exceptions to the findings mount to 281 mimeographed pages; it answers plaintiff’s exceptions in the • course of its own exceptions as well as in its brief of 169 mimeographed pages. The total argumentation is 826 pages. Copious references are also-made to the findings requested from the Commissioner.

 Plaintiff’s unit bid prices on aggregates were increased to make up for the anticipated loss on wasted material.

 Plaintiff Insists that It anticipated about 1,000,000 cubic yards of stripped and scalped material. It actually removed 2,763,067 cubic yards. The contract did not give any estimate as to the probable amount of material to be stripped, scalped and wasted.

 A prime reason why it was not alerted by the contract drawings, plaintiff asserts, is that the comparable drawings for the earlier Bull Shoals and Norfolk Dam projects, with which the joint venturers were familiar, specifically designated clay-filled cavities as such, or warned that “open” cavities (shown by solid black symbols) probably had a soft clay filling (see findings 11, 12). As already indicated, the contract drawings for the quarry in Lee Mountain, while indicating cavities, did not say or suggest whether the cavities were open, clay-filled, or partially clay-filled. The defendant says that these differences in the treatment of cavities should have stimulated plaintiff to further inquiry.

 The Commissioner has found, and we assume arguendo, that no more specific reference was made to the field logs by the Government’s representatives at pre-bid conferences or interviews or during the negotiations, and that they were not seen by the plaintiff until after the work was completed.

 The defendant points out that the physical cores for Hole No. 1 had been ■shipped to Vicksburg for testing and were not available at the Bull Shoals Subofflce. For that hole, the main “results of all borings and tests” available at the subofflce would be the field logs.
Plaintiff emphasizes that the field logs were not shown to any bidder, but we do not find this Important since only two bids were received by the Gov-ernment on the Lee Mountain project.

 Although general warnings to visit the site or become acquainted with all information, etc., will not excuse an affirmative misrepresentation by defendant, see footnotes 8-9, infra, such general warnings cannot be disregarded and must be taken into account in interpreting the specifications and ■deciding whether there was in fact a misrepresentation. See Blauner Construction Co. v. United States, 94 Ct. Cl. 503 (1941); C. W. Blakeslee & Sons, Inc. v. United States, 89 Ct. a. 226, 250 (1939), cert. denied, 309 U.S. 659 (1940); Archie and Allan Spiers, Inc. v. United States, 155 Ct. Cl. 614, 296 F. 2d 757 (1961).

 See, e.g., Hollerbach v. United States, 233 U.S. 165 (1914) Christie v. United States, 237 U.S. 234 (1915); United States v. Spearin, 248 U.S. 132, 136 (1918); United States v. Atlantic Dredging Co., 253 U.S. 1 (1920); United States v. Smith, 256 U.S. 11 (1921); Dunbar & Sullivan Dredging Co. v. United States, 65 Ct. Cl. 567 (1928); Levering & Garrigues Co. v. United States, 73 Ct. Cl. 566, 573-74 (1932) ; Arcole Midwest Corp. v. United States, 125 Ct. Cl. 818, 113 F. Supp. 278 (1953); Potashnick v. United States, 123 Ct. Cl. 197, 105 F. Supp. 837 (1952); Railroad Waterproofing Corp. v. United States, 133 Ct. Cl. 911, 137 F. Supp. 713 (1956).

 See most of the cases cited in the preceding footnote.

 There have been a number of cases in -which contractors were required to scan Government information beyond the confines of the contract documents. See United States v. Atlantic Dredging Co., 253 U.S. 1, 3, 10 (1920); Levering & Garrigues Co. v. United States, 73 Ct. Cl. 566, 573-74 (1932); General Contracting Corp. v. United States, 88 Ct. Cl. 214, 248 (1939); C. W. Blakeslee & Sons, Inc. v. United States, 89 Ct. Cl. 226, 246 (1939), cert. denied, 309 U.S. 659 (1940); Puget Sound Bridge & Dredging Co. v. United States, 131 Ct. Cl. 490, 497, 130 F. Supp. 368 (1955).

 “GC-2 SITE INVESTIGATION AND REPRESENTATIONS.
“The contractor acknowledges that He has satisfied himself as to the nature- and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, and roads, uncertainties of weather, river stages,' tides or similar physical conditions at the site, the conformation and condition of the ground, the character, quality and quantity of surface and subsurface materials to be encountered, the character and equipment and facilities needed preliminary to and during the prosecution of the work and all other matters which can In any way affect the work or the cost thereof under this contract. Any failure by the contractor to acquaint himself with all the available information concerning these conditions will riot relieve Kim from responsibility for estimating properly the difficulty, or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the negotiation and execution of this contract, unless (1) such un *369 derstanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is assumed by the Government. Representations made but not so expressly assumed by the Government in the contract shaU be deemed only for the information of the contractor and the Government will not be liable or responsible therefor.”

 The specifications stated that “[t]here is available within the designated area and within the approved limits, shown on the drawings, an adequate supply of material from which fine and coarse aggregate meeting the requirements of Part IV of these specifications can be manufactured.” This provision was not a representation that sufficient rock could be extracted in a sidehill operation ; the areas referred to were the whole quarry area on Lee Mountain. See findings 25, 38, 41.

 See the opinion, supra, p. 2-3.

 Wunderlich Contracting Company was liquidated by resolution of its stockholders effective January 31, 1960. ItB Interest In this claim was transferred by the resolution to dissolve to the following persons who were joined as additional parties plaintiff by appropriate motion allowed by the court on March 23, 1960: Martin Wunderlich; E. Murielle Wunderlich; George P. Leonard; Anne Wunderlich; Robert Wunderlich; Wilma Leonard; Gerhard Bundlie, Trustee for Robert Wunderlich, Oril Wunderlich, Joyce Wunderlich (Reynolds) and Alys'Wunderlich (Bachler) ; and L. B. Furey.
Brown & Root, Inc., had a 25 percent Interest in the venture; Wunderlich, 20 percent; Morrison-Knudsen, 15 percent; Peter Kiewit Sons Company, 12% percent; J. C. Maguire, 7% percent; and the others 5 percent each.

 SC-12, Specifications [footnote In Board decision].

 Article 29. Reduction in Price [footnote In Board decision].

 Article 2. Changes. — Where the supplies to be furnished are to be specially manufactured in accordance with drawings and specifications, the Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings or specifications. Changes as to shipment and packing of all supplies may also be made as above provided. If sueh changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an- equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered, provided, however, that the Contracting Officer, if he determines that the facts justify sueh action, may receive and consider, and with the approval of the Secretary of the Army or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 11 hereof. But nothing provided in this article shall excuse the Contractor from proceeding with the contract as changed [footnote in Board decision].