**McELWEE-COURBIS CONSTRUCTION CO., Inc., et al., Plaintiffs,**

v.

**Joseph H. RIFE et al., and United States Fidelity & Guaranty Company, Defendants.**

**Joseph H. RIFE et al., Plaintiffs,**

v.

**McELWEE-COURBIS CONSTRUCTION CO., Inc., et al., Defendants.**

Civ. A. Nos. 5116, 5148.

United States District Court M. D. Pennsylvania.

Aug. 5, 1955.

Fisher, Ports & May, York, Pa., E. H. Cushman, Philadelphia, Pa., for McElwee-Courbis Construction Co. et al.

Markowitz, Liverant, Boyle, Rauhauser & Kagen, York, Pa., Hull, Leiby & Metzger, Harrisburg, Pa., for Joseph H. Rife et al.

FOLLMER, District Judge.

McElwee-Courbis Construction Co., Inc., and Ertel Construction Co.[1] (hereinafter called "Contractors") entered into a written contract with York City Sewer Authority, York, Pennsylvania, to construct certain alterations and additions to the City's existing Sewage Treatment Works (hereinafter called "Sewer Project") for the price or sum of $3,774,000. Thereafter, on April 2, 1952, Contractors entered into a subcontract with Joseph H. Rife and Clyde R. Strayer, co-partners trading as Strayer and Rife (hereinafter called "Subcontractors") for the performance of certain excavation and other work at said Sewer Project. This subcontract provided for a lump sum price of $510,000 payable by Contractors to Subcontractors in monthly installments as the work progressed upon certification of the engineer for said Sewer Project. It is undisputed that Subcontractors did proceed with their work and that in connection therewith, from time to time, Contractors have paid Subcontractors sums aggregating $298,243.50 until Subcontractors discontinued work on the project. Thereafter formal demand was made by Contractors on Subcontractors and their surety for arbitration as provided, in their opinion, by the contract. Subcontractors and surety refused to arbitrate because in their opinion the questions involved are not referable to arbitration.

On August 27, 1953 Subcontractors instituted suit in this Court (No. 4764) against Contractors claiming damages from alleged fraud in procuring a contract and breaches of contract, and demanded a jury trial. On September 10, 1953 Contractors filed their application and motion for stay of legal proceedings and petition for order directing arbitration. The proceedings were stayed and argument was had. While the matter was under advisement and undecided, Subcontractors proposed to defendants (Contractors) that the latter consent to Subcontractors filing an amended answer to the petition for arbitration. Contractors refused the consent. On November 20, 1953, while the issue was still under advisement, Subcontractors (the plaintiffs therein) moved for the dismissal of the complaint. No responsive pleading on the merits having been filed, plaintiffs' motion to dismiss was granted on July 27, 1954, the Court indicating "An order may be submitted." Plaintiffs did not submit such order but permitted the action to remain dormant until defendants (Contractors) procured such order of dismissal to be entered on November 20, 1954.

Coincident with the filing of the order of dismissal of action No. 4764, Contractors instituted suit (No. 5116) in this

1. Stephen A. Ertl, Jr., trading and doing business as Ertel Construction Co., is now deceased and Rosina C. Ertl and First Camden National Bank and Trust Company, Administrators of the Estate of Stephen A. Ertl, Jr., Deceased, have now been substituted.

Court against Subcontractors and their surety. Count One thereof pleads, inter alia, the facts above set forth and prays that an order be made compelling Subcontractors to proceed to arbitrate the dispute between them as required by their written contract. Count Two prays that an order be made compelling Subcontractors' surety to require its principal to proceed with the said arbitration or, in the alternative, to proceed therewith on behalf of the Subcontractors, its principal. Counts Three and Four aver that Subcontractors' surety bond provided that in no event shall the surety be subject to any suit, action or other proceeding thereon that is instituted later than June 30, 1955. Accordingly, as a precautionary measure these counts incorporate the issues involved in Counts One and Two as separate and distinct claims against the possibility that it might finally be determined that Contractors are not entitled to arbitration with respect to such issues, and demand judgment against Subcontractors in the sum of $176,286.15 with interest, representing the amount of their loss as a result of the breach of the contract, together with additional sums due by Subcontractors to suppliers of material, etc., for which Contractors may be liable, plus a further sum covering adjustment as set forth in the complaint. ·

On December 13, 1954, Subcontractors instituted a separate suit in foreign attachment against Contractors in the Court of Common Pleas of York County, Pennsylvania, which proceeding has been removed to this Court as Civil Action No. 5148.

Under date of February 21, 1955, Civil Actions Nos. 5116 and 5148 were consolidated by Order of Court.

Subcontractors (defendants) answered Contractors' complaint in No. 5116 averring, inter alia, that they have refused to arbitrate because Contractors have breached the contract and because the action is not referable to arbitration for the following reasons:

(1) plaintiffs by instituting a civil action have waived and relinquished the right to arbitration;

(2) defendants have and do disaffirm the contract;

(3) fraud and unconscionable conduct at inception by plaintiffs on defendants entitling the latter to disaffirm the contract;

(4) interferences and obstacles placed by plaintiffs in path of performance by defendants were breaches of such a nature as to entitle defendants to disaffirm the contract;

(5) the arbitration clause of the contract is limited to matters of payment, etc.;

(6) no jurisdiction to direct arbitration under Sections 2 and 4 of the Arbitration Act of July 30, 1947, c. 392, Section 1, 61 Stat. 669, 9 U.S.C. §§ 2 and 4.

The contract of April 2, 1952, between the Contractors and Subcontractors carries this clause:

"Article XXI. Disputes—Board of Arbitration: In case the Contractor and Sub-Contractor fail to agree in relation to matters of payment, allowance of loss or should either of them dissent from the decision of the Architect (or Engineer), then the matter shall be referred to a Board of Arbitration to consist of one person selected by the Contractor, and one person selected by the Sub-Contractor, these two to select a third. The decision of any two of this Board shall be final and binding on both parties hereto. Each party hereto shall pay one-half the expense of such reference. (on written notice of one of the parties hereto to the other)" [2]

Basically, the sole question at issue in this case is who owes whom and how much. It is to be expected in the performance of a contract of the size in-

---

2. The portion in parenthesis is a typewritten addenda inserted at the end of this paragraph.

volved here that many collateral issues would present themselves from time to time that would have a direct relation to the question of payment, e. g., how much must the Contractors pay versus how much are the Subcontractors entitled to? During the contract negotiations the parties, experienced in their field, obviously had these considerations in mind and agreed and so contracted that disputes, of course involving payment, should be submitted to practical experienced arbitrators who could speak a contractor's language and who would understand a contractor's problem. Having entered into a solemn written agreement to arbitrate neither party should be permitted to avoid arbitration by specious charges of fraud or deceit.

As above indicated, I am firmly of the opinion that the agreement of the parties to arbitrate should here be enforced unless the contract itself was completely vitiated by fraud or unless arbitration has been waived by the Contractors, both of which have been charged by Subcontractors.

The complaint in No. 5116 alleges that the plaintiffs (Contractors) were the low bidders on the Sewer Project for the sum of $3,774,000 and that the subcontract provided for a lump sum price of $510,000. In their answer the Subcontractors state, as to the amount of the subcontract, "the contract speaks for itself." In their sixth defense Subcontractors charge that the execution of the subcontract was obtained by fraud and misrepresentation by plaintiffs upon defendants (Subcontractors) to induce the subcontract bid price of $510,000; "that said figure of Five Hundred Ten Thousand ($510,000.00) Dollars was the total figure for said subcontract work in the breakdown prepared by the Plaintiffs for the York Sewer Authority, owner." That "On or about May 28, 1953, Defendant sub-contractors learned for the first time that the breakdown of the work being performed by Defendant subcontractors, as submitted to the York Sewer Authority by Plaintiffs on or about April

22, 1952, was Eight Hundred Ninety-four Thousand ($894,000.00).", and that "Plaintiffs would make an unconscionable profit on Defendant subcontractors' work of Three Hundred Eighty-four Thousand ($384,000.00) Dollars."

It is the Contractors' contention that Subcontractors voluntarily submitted to Contractors a proposal for $510,000 and in support thereof filed affidavits setting forth that under date of March 4, 1952, Subcontractors wrote Contractors as follows:

"The attached proposal is for the York Job about which I spoke to you over the phone yesterday.

"This proposal covers the grading and the yard piping. No quotation has been given for the items such as anchor bars. A quotation will be given for these if we agree on the price for the general work. I feel sure we will have no trouble to agree on a price for this work."

After the typewritten portion of this letter appears this notation in long hand,

"1 year after Start 5% up to 4 mo of Date $510,000"

Under date of March 25, 1952, Subcontractors wrote Contractors stating, inter alia, as follows:

"We received your sub-contractor's agreement form and have read it. It looks OK to us."

Again under date of April 1, 1952, Subcontractors wrote Contractors requesting certain additions and clarifications to the contract and inquiring "Will bond in the amount of the Lump Sum Bid of $510,000.00 be satisfactory?"

Subcontractors filed affidavit of Samuel Harbold setting forth, inter alia, that he is Secretary of York City Sewer Authority and was such prior to the execution by the Authority of its contract with the general Contractors; that on April 22, 1952, the general Contractors submitted a breakdown of their work under its contract which reflected a total charge of $894,000 for the work contemplated by Subcontractors' contract; that this

figure did not become known to Subcontractors until May 1953.

Subcontractors also filed affidavit of Joseph H. Rife setting forth that on or about February 16, 1952 he submitted a proposal to perform the subcontract work to Contractors and to other bidders for $815,000; that Contractors through William E. McElwee in response to this proposal represented among other things that their own breakdown, then being prepared for the York City Authority, was in the neighborhood of $500,000 and that this was based on their own experience on a job in New York State, and that on the basis of these representations deponent (Rife) was persuaded to submit the proposal of March 4, 1952 in the sum of $517,000; that on or about March 17, 1952 William C. McElwee met deponent (Rife) and Clyde R. Strayer at York, Pennsylvania, when McElwee repeated the above representations and further stated that Contractors' breakdown as prepared for filing with the York City Sewer Authority showed a figure for subcontract work of $510,000; that on the basis of these representations, Subcontractors agreed to make a proposal of $510,000 for the subcontract work and did so on or about March 18, 1952. Therein, according to Subcontractors, lies the fraud which, in their opinion, vitiates the contract and relieves them from the necessity of a compliance with the contract's arbitration provision.

Contractors finally filed an amended affidavit of William C. McElwee categorically denying the representations set forth in the Rife affidavit.

This, of course, presents a clear-cut question of fact which, if found to be true as charged by Subcontractors, may or may not constitute fraud in the inception of the contract.

In Goldstein v. International Ladies' Garment Workers' Union, 328 Pa. 385, 392, 196 A. 43, 47, the court quotes from Cardozo, C. J., in Finsilver, Still & Moss, Inc., v. Goldberg, Maas & Co., Inc., 253 N.Y. 382, 389, 171 N.E. 579, 69 A.L.R.

809: " 'Arbitration presupposes the existence of a contract to arbitrate. If a party to a controversy denies the existence of the contract and with it the jurisdiction of the irregular tribunal, the regular courts of justice must be open to him *at some stage* for the determination of the issue. The right to such a determination, *either at the beginning or at the end of the arbitration or in resistance to an attempted enforcement of the award*, is assured by the Constitution as part of its assurance of due process of law.' " (Emphasis supplied.)

Here the parties entered into a solemn written contract which contained a provision for arbitration and it is my opinion that mere allegations of fraud or false representation should not be permitted to vitiate that contract. To hold otherwise would make it possible for any disgruntled contractor to avoid his contractual obligations merely by glibly charging fraud or misrepresentation.

A broad question of public policy is here involved. Arbitration has received the stamp of approval of the Congress, of the Legislature of the Commonwealth of Pennsylvania, and of the courts, federal and state.

The affidavits filed here, construed in the light most favorable to Subcontractors, are not in my judgment sufficient to thwart the parties' agreement to arbitrate. If the hearings before the arbitrators clearly indicate such fraud in the inception of the contract as to vitiate it, Subcontractors will be afforded an opportunity for such judicial determination at the end of the arbitration as they may, in the judgment of the Court, be entitled to at that time.

Secondly, as to the question of waiver. The performance bond filed by Subcontractors contained this proviso,

"4. In no event shall the Surety be liable for a greater sum than the penalty of this Bond, or subject to any suit, action or other proceeding thereon that is instituted later than June 30, 1955."

Contractors filed their complaint November 20, 1954. In Counts One and Two of the complaint Contractors seek an order compelling Subcontractors and their surety to proceed with arbitration in accordance with the terms of the subcontract. In Counts Three and Four, as separate and distinct claims, Contractors request in the event that it finally be determined that Contractors are not entitled to arbitration with respect to the dispute set forth in Counts One and Two, and having in mind the time limitations in the bond in relation to the liability of the surety, that judgment be entered against Subcontractors and surety as therein prayed.

■■ The complaint clearly indicated their first consideration was to preserve their rights to arbitration but at the same time, and in the alternative, to reserve their right to proceed to judgment against Subcontractors and their surety, in accordance with the terms of the bond, in the event it finally be determined they were not entitled to arbitration. To constitute a "waiver" there must be an intentional relinquishment of a right with both knowledge of its existence and intention to relinquish it. American Locomotive Co. v. Chemical Research Corp., 1948, 6 Cir., 171 F.2d 115; see also Wilson & Co., Inc., v. Fremont Cake & Meal Co., 1948, D.C.Neb., 77 F.Supp. 364, 380. Contractors did not waive the contract provisions for arbitration.

Finally, Subcontractors contend that Contractors' motion for an order directing arbitration must be denied in view of the fact that Section 4 of the Federal Arbitration Act, 9 U.S.C. § 1 et seq., is limited to maritime transactions or interstate commerce "neither of which is involved in this purely local contract and transaction."

In Tenney Engineering, Inc., v. United Electrical Radio & Machine Workers of America, (U.E.) Local 437, 1953, 3 Cir., 207 F.2d 450, 453, the Court in speaking with reference to this statute said, inter alia:

"*  *  *  For it is settled that Section 3, being a purely procedural section, applies to all contracts for arbitration which may be involved in suits properly brought in the federal courts and not merely to those maritime transactions or contracts evidencing transactions involving interstate, foreign or territorial commerce the arbitration clauses of which are made valid and enforceable by the substantive provisions of Section 2 of title 9.  *  *  *"

■ I am of the opinion that the procedures of stay of trial, Section 3, order to proceed with arbitration, Section 4, and the Court appointment of arbitrators, Section 5, are in pari materia, each supplementary to the other in the order named and together affording a complete remedy under the Act.

In International Union United Furniture Workers of America v. Colonial Hardwood Flooring Co., Inc., 4 Cir., 1948, 168 F.2d 33, 37, the Court (Parker) said, inter alia:

"*  *  *  No change was made, however, in the language of sections 3 and 4, which dealt with procedure in the courts, over which Congress had plenary jurisdiction.

"We have heretofore held that section 3 of the act should not be interpreted as limited by the provisions of section 2. Agostini Bros. Bldg. Corp. v. United States, 4 Cir., 142 F.2d 854. *The reasoning of that decision would apply equally to section 4 and the succeeding sections.*  *  *  *"  (Emphasis supplied.)

In Donahue v. Susquehanna Collieries Co., 3 Cir., 1943, 138 F.2d 3, 4, 149 A.L.R. 271, the Court posed the question thus

"The second question is whether § 3 of the Act, which provides for a stay of proceedings in a lawsuit until arbitration proceedings have been

had, is limited to the contracts and transactions described in § 2."

The Court then gives its appraisal of the Act as follows:

"Then in § 3 the statute deals with the conduct of suits in federal courts, again a subject matter of congressional power. The language becomes general: 'any suit or proceeding', upon 'any issue referable to arbitration under an agreement in writing for such arbitration' are the words. Congress is not limited, in legislating as to law suits in federal courts, to those suits involving matters where the substantive rights of the parties may be controlled by federal legislation. The generality of the language used in the statute does not suggest any self-imposed limitation. Nor do we think that the 'congressional approval of arbitration' should be so limited by implication, by a grudging type of construction carried down from the days of judicial hostility to all arbitration agreements. We think it clear that the provisions of § 3 are not to be limited to the specific instances dealt with in § 2.

" * * * As indicated above, we think the Act is entitled to a construction which will accomplish its purpose, and should not be hedged about with imagined limitations, as has been done in some instances.

\* \* \* \* \* \*

"Here again we should not choke the arbitration process which has been given congressional approval by the fetters of earlier judicial conceptions."

I am clearly of the opinion that a stay should be granted and that Subcontractors, Strayer & Rife, should be directed to proceed to arbitration in accordance with the provisions of Article XXI of the subcontract dated April 2, 1952.

■ What has been said here on the matter of fraud and misrepresentation is predicated on such uncontradicted facts as were before the Court at this initial stage in the proceedings and has relation only to the question of what bearing it might have on the issue of compelling, in the first instance, compliance with the arbitration clause. It naturally should not be considered as res adjudicata or binding upon the arbitrators on any issue which they may properly consider in arriving at their final determination after a full hearing of all the evidence presented to them by all the parties.

An order may be submitted.