**MERRITT–CHAPMAN & SCOTT COR-
PORATION, Plaintiff,**

v.

**PENNSYLVANIA TURNPIKE COMMIS-
SION, Defendant.**

Civ. A. No. 9153.

United States District Court
M. D. Pennsylvania.

Nov. 28, 1966.

McNees, Wallace & Nurick, Harris-
burg, Pa., Martin S. Michelson, John P.
Kane, Hartford, Conn., for plaintiff.

Metzger, Hafer, Keefer, Thomas &
Wood, Special Counsel, Harrisburg, Pa.,
for defendant.

## OPINION

FOLLMER, District Judge.

This matter is before the Court on motion of defendant to stay the above-captioned action and all proceedings therein until an arbitration shall be held in accordance with the terms of the contract entered into between plaintiff and defendant.

As grounds for the motion, defendant alleges that:

1. On August 6, 1962, plaintiff contracted with defendant for the construction of Allegheny Tunnel No. 2 on the Pennsylvania Turnpike in Allegheny and Stony Creek Townships, Somerset County, Pennsylvania, which contract was designated "Contract 145–1".

2. Sections 1.9.9 and 1.10 of the General Requirements and Covenants of said contract provide as follows for the presentation and disposition of plaintiff's claims:

"1.9.9 PRESENTATION OF CONTRACTOR'S CLAIMS—

\* \* \* \* \* \*

"(1) Manner of Presenting Claims. All claims for additional compensation, or for damages, arising out of this contract or in any manner related thereto, or any breach of said contract, including claims for additional compensation for any work performed which was or was not covered by the approved drawings, specifications or contract, or for any other cause, including damages for delay, shall be prepared in writing by the contractor in detail and submitted in triplicate to the Chief Engineer.

"No claim may be submitted to the Chief Engineer unless the contractor shall have given the Chief Engineer due written notice of his intention to present such claim in the manner hereafter designated; provided, that the contractor shall not be denied the right to present any claim which is based on differences in measurements or errors in computations which were not dis-closed until final computations were made.

"The written notice as above required must have been given to the Chief Engineer prior to the time that the contractor shall have performed such work, or that portion thereof, giving rise to the claim or claims for additional compensation; or shall have been given to the Chief Engineer, within ten (10) days from the date the contractor was prevented by the engineer from performing any work provided by the contract; or within ten (10) days from the happening of the event, thing or occurrence giving rise to the alleged claim.

"(2) Limitation of Time for Submitting Claims. The date on which the Chief Engineer notified the contractor of the final payment computations, or revised computations, shall be the date from which the time limit shall begin to run for the submission of claims to the Board of Arbitration named in Section 1.10.

"No claim will be entertained by the Board of Arbitration unless such claim has been presented to the Chief Engineer in detail within three (3) months from the date of the notification above, and before final payment is made.

"Section 1.10 ARBITRATION

"The Chief Engineer shall render his decision upon the claim or claims in due course, and when such decision has been served upon the contractor, he shall be deemed to have accepted the same unless he shall, within fifteen (15) days thereafter, have submitted the claim, in the precise language it was presented to the Chief Engineer, to a Board of Arbitration. Such Board of Arbitration shall consist of the Consulting Engineer or an engineer designated by the Consulting Engineer, an engineer designated by the contractor, and the Commission's Counsel. Such claims shall be submitted to the Board in triplicate and shall conform in every detail with the

claim as submitted to the Chief Engineer. The Arbitrators, after hearing, shall make their decision regarding the claim or the claims submitted, and thereafter notify the Commission and the contractor thereof in writing. The decision of the Arbitrators, or a majority of them, shall be final, except as provided by statute."

3. Commencing on June 5, 1964 and continuing through July 16, 1965 plaintiff has submitted to arbitration thirty-three separate claims in the total amount of $946,838.20 in accordance with Section 1.10 Arbitration set forth in numbered paragraph 2 above.

4. Each letter transmitting and submitting said thirty-three claims to arbitration contained the following paragraph:

"Be advised that we hereby appeal the decision of the Chief Engineer to the Board of Arbitration provided for under Section 1.10 Arbitration of the General Requirements and Covenants of the Contract. In accordance with Section 1.10 Arbitration of these Requirements, transmitted herewith are three (3) copies each of the claim as submitted to the Chief Engineer."

5. On February 12, 1965 plaintiff notified defendant it had designated A. A. Mathews as a member of the Board of Arbitration as provided in Section 1.10 above.

6. By agreement with defendant, plaintiff took certain depositions and conducted discovery at the Administration Building of defendant, at its Field Office near the site of the construction and in the principal office of the Consulting Engineer of defendant, which discovery proceedings continued through September 22, 1965.

7. In the meantime the Board of Arbitration was not convened for the taking of testimony.

8. By letter of October 8, 1965, A. A. Mathews, engineer-designee of plaintiff on Board of Arbitration notified defendant that he could not serve.

9. By letter of October 19, 1965, defendant notified plaintiff to designate another engineer in place of Mathews.

10. To date plaintiff has failed to make such designation.

11. The claims set forth in this action arise out of or relate to the aforesaid contract and are substantially the claims which plaintiff has submitted to arbitration as aforesaid.

12. Both Section 2 of the Pennsylvania Arbitration Act of April 25, 1927, P.L. 381, as amended, 5 P.S. § 162, and Section 1 of the Federal Arbitration Act of July 30, 1947, c. 392, § 1, 61 Stat. 669, 9 U.S.C. § 3, provide that should any action be brought in any court upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such action is pending shall, upon application of one of the parties to the agreement, stay the matter until such arbitration has been had in accordance with the terms of the agreement.

Plaintiff contends that during the course of constructing the tunnel, it encountered unexpected problems and difficulties which prolonged the project and caused the same to become considerably more costly than was originally anticipated. Plaintiff further contends that during the course of depositions and certain other discovery proceedings which took place subsequent to the tunnel's completion, it became aware of certain geological information and other data which defendant had in its possession, and it is the belief of plaintiff that this information evidences culpable conduct on the part of defendant and its Consulting Engineer. It is this alleged culpable conduct which gives rise to plaintiff's cause of action sounding in fraud, misrepresentation and negligence.

Plaintiff further contends that:

1. The arbitration clause relied on by the defendant should be set aside due to the defendant's actual and/or constructive fraud in inducing the plaintiff to agree to the said clause.

2. The scope of the arbitration clause relied on by the defendant does not encompass all the claims presented in the instant suit.

3. The defendant cannot rely on the cited contract arbitration clause to stay proceedings on the Tenth Count of plaintiff's Complaint since said count alleges that the entire contract was voided by defendant's misrepresentation and/or fraud.

Plaintiff also contends that it was not until after discovery was completed that it became aware of the alleged fraud. However, defendant argues that the carrying out of a contract for the construction of a tunnel is an undertaking in which neither the owner (the Commission) nor the contractor can have anywhere near absolute information as to what soil conditions will be encountered. Having this in mind, there appears in the contract the following:

"1.2.4 FAMILIARITY WITH PROPOSED WORK—

"The contractor is required to examine and familiarize himself with the site and make such sub-surface exploration as he deems necessary in connection with his bid. The core borings and related information made and developed for the exclusive use of the Commission in designing the project may, if the contractor wishes, be examined by him upon request to the engineer. This information is not guaranteed and reliance thereon by the contractor shall be at his own risk, and the Commission, in making this information available to the contractor, assumes no liability for misinformation obtained therefrom or resulting from his interpretation thereof."

Since the exact soil conditions could not be known until the actual tunneling was in progress, the method of tunneling and the type of support was expressly made the obligation of the contractor as follows: (Contract Item T1—Class 1 Excavation-Tunnel, A., General, p. 13.)

"Tunneling shall be done by method best suited to the local conditions and which does not involve any injury to the foundations, walls, or parts of adjacent structures, or surfaces, which method shall be subject to approval by the Engineer before the work is commenced. The method shall be changed from time to time, if, in the judgment of the Engineer, local conditions so require. Tunnel steel supports for supporting the tunnel are shown on the drawings, but other types of steel supports may be ordered or approved. The approval by the Engineer of the methods of tunneling or the failure of the Engineer to call attention to improper or inadequate methods or to require a change in methods *will not relieve the Contractor of his responsibility for the proper excavation of the work.*" (Emphasis supplied.)

Also see Item T33—Fabricated Structural Steel for Tunnel Support as follows: (pp. 53–54)

"This work shall consist of furnishing and erecting, to the lines, grades and details shown on the plans, structural steel for supporting the tunnel. Included in tunnel supports are arch ribs, columns, spreaders, steel lagging, lateral bracing, crosspassageway columns, and beams, the shimming of columns, the necessary bolting, welding or riveting, and all structural steel at both rock portal buttresses. The type, size and approximate spacing of the supports are shown on the plans. The Engineer may order greater or closer spacing, or larger or smaller sizes as required by conditions arising during the boring of the tunnel. Alternate methods of steel supports both as to size, type, and spacing may be submitted by the Contractor for approval of the Engineer. These plans shall fully describe the type of support proposed, the sizes and the spacing of members and all proposed modifications of the contract drawings. The Engineer may approve the Contractor's proposal or he may order modifications of the type proposed, or the adoption of a different type.

*"The Contractor must take full responsibility for the sufficiency of the support, and the Contractor will not be relieved from this responsibility by the failure of the Engineer to order increased strength.* If the Contractor shall be of the opinion, and shall so certify in writing, that he regards the supports as unsafe, the Engineer still may order the work done and the Contractor shall be relieved from the responsibility for the successful result, but not for the energetic prosecution, of the work. The repair of any settlement or failure due to the use of smaller sizes, wider spacing or lighter type ordered by the Engineer will be paid for under Section 1.9.2, Form 408." (Emphasis supplied.)

A study of the contract makes it perfectly clear that the Commission recognized that the construction of a tunnel is an undertaking in which neither the owner (Commission) nor the contractor can have any where near absolute information as to what soil conditions will be met. Because of this uncertainty the Commission deliberately placed upon all potential bidders the obligation of familiarizing themselves with the tunneling conditions which they would likely encounter and the responsibility of conducting their tunnel operation in a manner to best meet the soil conditions they found and to provide the necessary support to insure that a safe, adequate tunnel was constructed.

The tunnel here in question paralleled an existing tunnel and the contractor had actual and constructive notice of this and any information in the possession of the Commission concerning Allegheny Tunnel No. 1 was available to contractor.

As evidence of the above, the contract discloses:

1. The Commission rejected the responsibility for the accuracy of the existing subsurface information and imposed on contractor a duty to make an independent investigation. (Section 1.2.4, supra)

2. The Commission advised bidders that conditions would vary and that different methods of excavation might be required from time to time and that the contractor was responsible for proper excavation of the tunnel. (Supplemental Specifications, Item T1 A., p. 13.)

3. The Commission advised bidders that bad or dangerous conditions may exist and that the contractor was required to exercise reasonable precautions relative to same. (Supplemental Specifications Item T1 D., pp. 16–17.)

4. The Commission advised bidders that conditions might be such that direct excavation to the "net line" (Supplemental Specifications Item T1 A., p. 13) might not be possible and that pilot headings and drifts might be required as a preliminary step. (Supplemental Specifications, Item T1 E.)

5. The Commission advised bidders that greater or closer spacing or larger or smaller sizes of steel supports might be required by conditions arising during the boring of the tunnel and that the contractor must take full responsibility for the sufficiency of the support. (Supplemental Specifications, Item T33.)

These obvious protective measures taken by the Commission must have been known to contractor when the contract was executed. It has not been made clear to me just what, if any, steps were taken by contractor to secure further information from the Commission, particularly since it was directed to the same by the General Requirements and Covenants of the contract. (Section 1.2.4)

In O'Neill Construction Company, Inc. v. City of Philadelphia, 335 Pa. 359, 361, 6 A.2d 525, 526 (1939), the Court said:

"Ordinarily, * * * a contractor is presumed, in the absence of an express provision to the contrary, to have assumed the risk of unforeseen contingencies arising during the course of the work, unless performance is rendered impossible by an act of God, the law, or the other party: * * *"

In answer to plaintiff's claim of fraud and misrepresentation, the case of Flippin Materials Company v. United States, 312 F.2d 408, 160 Ct.Cl. 357 (1963), is

directly in point. The contractor there bid to excavate large quantities of rock and the main issue as stated by the Court at page 410, "arises out of the plaintiff's claim that the defendant misrepresented the nature of the material." The Court found that in addition to the actual cores of the borings, defendant had filed logs which contained considerably more information than was shown on the drawings. The field logs contained the information needed by plaintiff to properly evaluate the unit cost of excavation. Findings by the Court included: "that it was customary to make such field logs; that this was known to plaintiff, * * * that the field logs were kept * * * where the actual boring-cores were on display and inspected by plaintiff's representatives; that had plaintiff asked to see these logs they would have been permitted to do so * * *." (312 F. 2d at 411–412.)

The Court further stated: (312 F.2d at 412)

" * * * The contract also contained the usual warning and exculpatory provisions requiring the contractor to investigate conditions for itself * * * and providing that 'any failure by the contractor to acquaint (itself) with all the available information concerning these conditions will not relieve (it) from responsibility for estimating properly the difficulty or cost of successfully performing the work' * * * ."

The Court in the Flippin case, supra, in denying recovery to the contractor, held that the contract put the contractor, which was experienced in these matters (as is the case here), on sufficient notice that there was other information in the possession of the Government which would have been of value to the contractor in making his bid and choosing the most efficient method of excavation.

As to the selection of the method of operation, the Court stated: (312 F.2d at 415–416)

" * * * The Commissioner has also found * * * that both parties

originally contemplated a sidehill operation and that in the course of performance plaintiff changed (with defendant's approval) from a sidehill operation to an operation at the crest, because it believed that much more waste would result from continuing to work at the side. These facts do not warrant reformation of the contract for mutual mistake.

"There are many contract misapprehensions, common to both parties, which fall short of requiring reformation. See V Williston, Contracts (rev. ed.), Secs. 1538, et seq. In particular, a mutual mistake as to a fact or factor, even a material one, will not support relief if the contract puts the risk of such a mistake on the party asking reformation (United States v. Hathaway, 242 F.2d 897 (C.A.9, 1957)), or normally if the other party, though made aware of the correct facts, would not have agreed at the outset to the change now sought (Williston, supra. Secs. 1547, 1548, 1549). Both of these conditions are present here. The elaborate contract provisions on 'Site Investigation and Representations', together with the omission of the usual changed conditions clause, show that the risks of mistakes as to subsurface materials were deliberately placed on the plaintiff; in the absence of misrepresentation, the contractor was to be bound by what he met during performance. United States v. Hathaway, supra, 242 F.2d at 899–901; American Elastics, Inc. v. United States, 187 F. 2d 109, 112, 113 (C.A.2, 1951); see also footnote 7, supra. Moreover, there was no misunderstanding on the Government's part as to what plaintiff might have to do to fulfill the contract at the specified prices. As the Commissioner has found without dispute, the defendant contemplated a sidehill operation but did not require it or put another method out of mind. * * * "

In Hunt and Willett, Inc. v. United States, 351 F.2d 980 (Ct.Cl.1964), where recovery was denied a contractor who

had failed to avail himself of all the information that might have been material in making his bid, the Court stated (at pp. 985–986):

> "* * * there was no obligation on the Government to volunteer facts which could reasonably have been discovered through plaintiff's own investigation and pursuit of leads given by the contract papers. * * *
>
> * * * * * *
>
> "Where the contract incorporates such a clause, the contractor has no claim if the missing information would have been obtained through the inquiries contemplated by the article. * * *
>
> "* * * A 'contractor cannot call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitation to bid.' The contractor cannot 'rest content with the materials physically furnished to him; he must also refer to other materials which are available and about which he is told by the contract documents.' Flippin Materials Co. v. United States, supra, 312 F.2d at 414 (footnote omitted)."

See also, McElwee-Courbis Construction Co., Inc. v. Rife, 133 F.Supp. 790, 794 (M.D.Pa.1955), in which this Court said:

> "Here the parties entered into a solemn written contract which contained a provision for arbitration and it is my opinion that mere allegations of fraud or false representation should not be permitted to vitiate that contract. To hold otherwise would make it possible for any disgruntled contractor to avoid his contractual obligations merely by glibly charging fraud or misrepresentation."

In addition, in the instant case plaintiff submitted thirty-three separate claims to arbitration, appointed its representative on the Board of Arbitration and conducted discovery proceedings before commencing the action.[1]

In paragraph 10 of the Tenth Count, contractor alleges that the Commission "willfully concealed the said geological information and other data". I find no evidence in this case to warrant such a statement. On the contrary, the contract documents directed the contractor to the very information which it avers was concealed.

In McElwee-Courbis, supra, this Court indicated that where fraud in the inception of the contract is alleged, the Court will, nevertheless, compel arbitration, leaving to a later time the determination of the question. The Court there stated: (at page 794)

> "* * * If the hearings before the arbitrators clearly indicate such fraud in the inception of the contract as to vitiate it, Subcontractors [plaintiff] will be afforded an opportunity for such judicial determination at the end of the arbitration as they may, in the judgment of the Court, be entitled to at that time."

In the case of an ambiguous arbitration clause, a presumption of arbitrability of fraud in the inducement should be indulged. 12 Cornell L.Q. 351.

We are convinced that since the matters subject to arbitration in the instant case include claims for additional compensation or damages *in any manner related to the contract, or any breach thereof or for any other cause*, the allegation of fraudulent inducement is properly referable to arbitration. Accordingly, in accordance with the provisions of 5 P.S. § 162, defendant's motion to stay the action until arbitration shall be had in compliance with the terms of the contract will be granted.

Finally, plaintiff now argues that because two of the three arbitrators have a connection with the Commission that its claims should not be submitted to this Board of Arbitration.

Section 1.10 of the contract specifically provides that the Board of Arbitration

---

1. Plaintiff contends that it knew nothing of the alleged fraud until it had completed this discovery.

shall consist of the Consulting Engineer or an engineer designated by the Consulting Engineer, an engineer designated by the contractor, and the Commission's counsel. During the pendency of the instant proceedings the Consulting Engineer removed himself from the Board and named Marcel M. Fertig, an independent consulting engineer, to take his place.

■ Contractor obviously knew at the time it voluntarily entered into the contract containing the provision for a Board of Arbitration to pass *upon all claims arising out of or in any way related to the contract, or any breach of said contract, or for any other cause,* that two of the three members of the Board of Arbitration provided for therein were connected with the Commission (Consulting Engineer and Commission's counsel); contractor also knew this fact when it submitted its claims to arbitration. Certainly, under the facts of this case, contractor waived any objection it might otherwise have had as to the personnel of the Board.

The principal of law involved here is clearly set forth in 65 A.L.R.2d 755, 764, as follows:

"§ 5.  Waiver of right to object.

"Even though an arbitrator may appear to be biased, because of relationship to one of the parties, or prejudiced for other reasons, an action to stay an arbitration or to disqualify an arbitrator will not be successful if the moving party knew at the time the agreement was made of the facts alleged to constitute bias or prejudice, or failed to object at the earliest opportunity in the arbitration proceedings. This is so even in an action to set aside an award on the basis of bias or prejudice.

\*     \*     \*     \*     \*     \*

"Even though an arbitrator is essentially a representative of one of the parties, it has been held that an arbitration will not be stayed if the parties have voluntarily entered into such an agreement. Jackson v. Barry R.

Co. (Eng) (1893) 1 Ch. 238 (CA), refusing to stay an arbitration where the question to be decided was a dispute between a contractor and the engineer of the other party, where the agreement provided that such disputes must be referred to the engineer for arbitration."

As the Court said in an early case, The North Lebanon Railroad Co. v. McGrann, et al., 33 Pa. 530, 533 (1859), in referring to the selection of the chief engineer of the company (owner): "We have nothing to do with the prudence of such an agreement. It is ours to enforce the contract as the parties have made it. A party litigant may refer to his adversary, if he will, or to any one interested adversely to himself."

■ Pennsylvania Statute, 5 P.S. § 162, Stay of proceedings brought in violation of arbitration agreement, and Federal Statute, 9 U.S.C. § 3, Stay of proceedings where issue therein referable to arbitration, are for all practical purposes identical in providing that the court in which said suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration. Under the Federal Arbitration Act the court's power to deal with bias is limited to setting aside the award after it has been rendered. Petition of Dover Steamship Company, Inc., 143 F.Supp. 738, 742 (S.D.N.Y.1956).

I am convinced in this case that the issues here involved are referable to arbitration and that the plaintiff is not in a position to object to the personnel of the Board of Arbitration.

Defendant's motion that the above-captioned action and all proceedings therein be stayed until an arbitration shall be held in accordance with the terms of the contract entered into between plaintiff and defendant will be granted.